LEOPOLD WISE *et al.*, Appellants, *against* ANDREW W. MORGAN, Respondent.

(Decided December 28th, 1885).

Defendant and others, officers of the M. P. Life Insurance Company, wrote to certain trustees of the W. & O. Life Insurance Company, a letter, proposing, as the result of negotiations for the consolidation of the business of the two companies, the purchase of the whole of the capital stock of the W. & O. Company by the M. P. Company, in which, after stating the methods of accomplishing and the purposes of the proposed consolidation, they said: "It need hardly be said, but for greater clearness we do say, and thereto pledge ourselves, that the contract obligations entered into by the W. & O. Company with its policy holders and others, of every name and nature, will be rigorously fulfilled to the same extent and in the same manner as if no change such as is contemplated should take place." And at the end of the letter, in a distinct instrument signed by them, they wrote : "We hereby individually and collectively guarantee the fulfillment of the agreement in the foregoing letter." The W. & O. Company having appointed a special committee to consider and report upon the proposed fusion, another letter was addressed to such committee by the M. P. Company signed by defendant and another as officers of the latter, in which, referring to their previous communication as containing a formal agreement to abide by the contract obligations of the W. & O. Company already existing, they said further: "We repeat that pledge here, and add, that in our understanding, it embraces agreements with agents and others, as well as policy-holders." The proposition thus made was accepted by the W. & O. Company and was carried out. The W. & O. Company was solvent at the time; and soon afterwards, in consideration of the payment by it of a large amount of money, the M. P. Company agreed to assume all its liabilities. Nearly six years afterwards, both companies were dissolved, and at that time the assets of the W. & O. Company were insufficient to re-insure its outstanding risks, there being a large deficiency. *Held* that the owners of

a paid up endowment policy of the W. & O. Company which became due after the dissolution, and upon which they had received dividends on the settling up of the affairs of that company, were not entitled to recover from the defendant, upon the guaranty signed by him with others, as above mentioned, the amount remaining due upon the policy .after deducting the payments received. The guaranty signed by defendant amounted to nothing more than an assurance to the trustees who were to obtain the stock required, and to the special committee to whom the matter was referred, that the new trustees who were to be appointed, and who were to have thereafter the control of the W. & O. Company's affairs, would, in conducting its affairs thereafter, recognize and fulfill all its pre-existing contract obligations, whether to policy holders or to others; and did not bind the signers, unqualifiedly and absolutely, under all circumstances, to pay all the policy holders of the W. & O. Company when their policies became due, or what might remain due upon them if the company should thereafter become insolvent and be unable to pay them.

APPEAL from a judgment of this court entered upon the dismissal of a complaint at the trial and from an order denying a motion for a new trial.

The facts are stated in the opinion.

*Raphael J. Moses, Jr.*, for appellant.

*P. H. Vernon*, for respondent.

CHARLES P. DALY, Chief Justice.—The Mutual Protection Life Insurance Company being desirous of purchasing a controlling interest in the Widows' & Orphans' Benefit Life Insurance Company, made a proposition to do so to five trustees of the latter company, which was followed by a negotiation; the result of which negotiation the Mutual Protection Company embodied in the form of a written communication to the five trustees aforesaid, offering to purchase the whole of the capital stock of the Widows' & Orphans' Company, at par, if not less than $100,000 or more than $110,000 of said stock, assigned in blank, was placed in the hands of Mr. R. McCurdy, within fifteen days after the date of this communication, with whom the Mutual Protection Company had deposited the sum of $105,000 in cur-

rency, and had agreed to furnish him, on demand, the balance needed, if any, to consummate the purchase proposed, which was to be held by him until the consummation of the arrangement provided for in the communication, but which was not to exceed the fifteen days before stated.

The arrangement proposed was, that as soon as practicable after the stock certificates were secured, a meeting of the board of trustees of the Widows' & Orphans' Company should be called, when a majority of the trustees were to resign their positions, and the remaining members were to fill the vacancies by the election of certain gentlemen named in the communication, one of whom was the defendant in this suit. Upon the resignation of a majority of the trustees, and the election of their successors, Mr. McCurdy was to pay to each prior holder of such certificate, the par value of it together with the accrued interest thereon from the first day of July previous, in gold or its equivalent in currency, and he was then to distribute to the incoming trustees the stock placed in his hands, in the proportions which the Mutual Protection Company should direct. The communication expressed the highest appreciation of the known character and ability of the then trustees of the Widows' & Orphans' Company, but declared that the Mutual Protection Company felt justified in saying that the interests of the policy holders of the Widows' & Orphans' Company could not be in custody more capable, intelligent and trustworthy than that of the gentlemen named in the communication; that the object proposed, in making the purchase, was to consolidate the Widows' & Orphans' Company with the Mutual Protection Company, under the expectation that the result would be a diminution of the cost of conducting the companies as single companies, with separate offices, in New York and other cities; together with other incidental expenses; and that with the experience and practical knowledge of the Mutual Protection Company the interests of all parties, *policy holders* as well as *stockholders*, would be considerably enhanced.

The agreement further stated that the position of the

Wise v. Morgan.

Mutual Protection Company was one of perfect solvency and security; that its assets then, although not so great as those of the other—it being a younger company—offered a security of over 150 per cent. to its liabilities, while those of the Widows' & Orphans' Company, by its last official statement, offered only 136 per cent.; and that the Mutual Protection Company, although not half the age of the other, was doing then a larger and better business; that by the proposed fusion, one company of strength and solidity would be substituted for two companies of moderate means, and the security to the policy holders of the Widows' & Orphans' Company, must, in consequence of the Mutual Protection Company's greater ratio of assets to liabilities, be increased, instead of diminished; and finally, the communication contained this statement, which is given verbatim, as it, with a guaranty hereafter referred to, is what is relied upon as the foundation for this action: "*It need hardly be said*, but for *greater clearness*, we do say, *and thereto pledge ourselves*, that the contract obligations entered into with the Widows' and Orphans' Company with its policy holders and others, of every name and nature, will be *rigorously fulfilled*, to the *same extent*, and in the *same manner* as if *no change*, such as is contemplated *should take place*." And at the end of this communication, in a distinct and separate instrument, the following guaranty was signed by four persons, one of whom was the defendant in this suit: "In consideration of $1, to each of us paid, and for other valuable considerations us thereunto moving, we hereby individually and collectively guarantee the fulfillment of the agreement in the foregoing letter of the Mutual Protection Life Insurance Company."

The Widows' & Orphans' Company having appointed a special committee to consider and report upon the proposed fusion, the Mutual Protection Company, on the 13th of October, 1871, addressed a written communication to the chairman of the committee, which, among other things, contained this passage: "In our communication of the 5th inst., to Messrs. Husted and others (the five trustees), we

formally agreed to abide by the contract obligations of the company already existing. We repeat that pledge here, and add that, in our understanding, it *embraces agreements with agents and others as well as policy holders*. The contracts with agents we will ratify, if desired."

The proposal thus made was accepted and carried out. At a meeting (19th October 1871) of the Widows' & Orphans' Company, a majority of the trustees resigned, and the persons named in the written communication were elected in their place. The stock deposited with McCurdy was paid for out of the money in his hands, and the stock was distributed by him, as provided for in the communication.

At the time this arrangement was carried out, the Widows' & Orphans' Company, according to the testimony of Charles H. Raymond, the president of its board of trustees, was solvent and had a surplus in relation to its policy holders of over $100,000. He testified that there was nothing in the carrying of its business—which was good—or its assets, or its management, which would have prevented its paying them dollar for dollar of its liabilities. It was, he said, at the time abundantly able to pay all its debts and liabilities. Its capital stock was $200,000, which was reported by the Insurance Department as being deficient some $60,000 to $70,000. He was asked the question whether he did not think that its assets, at the time, were insufficient to re-insure its risks, to which he said "no," although at the time he believed them to be insufficient, being mistaken as to the amount.

Twenty-three days afterwards a contract was entered into between the two companies, by which the Mutual Protection Company agreed to assume all the liabilities of the Widows' & Orphans' Company for a consideration received of $1,434,511.12; the receipt of which consideration is acknowledged in the agreement.

On the 8th of March, 1877, the Widows' & Orphans' Company and the Mutual Protection Company, the latter then under the name of The Reserved Mutual Life Insurance Company, were dissolved by the Supreme Court, under

the statute of the state; at the time of which dissolution, that is, on the 8th of March, 1877, the assets of the Widows' & Orphans' Company were insufficient to re-insure its outstanding risks, there being a deficiency of 78 per cent.

The plaintiffs in this suit are the assignees of a paid up endowment policy of the Widows' & Orphans' Company, which was due after the dissolution—that is, on the 27th day of April, 1877. The plaintiffs received dividends upon the settling up of the affairs of the Widows' & Orphans' Company, and the present action is brought against the defendant, as one of the four persons who signed the guaranty referred to, to recover $1,770.42, the amount remaining due upon the policy after deducting the payments received.

His liability, as stated in the complaint, is put upon the ground that the contract obligations of the Widows' & Orphans' Company with the plaintiffs, as policy holders, were violated on the 8th of March, 1877, the day of the dissolution of the company, by its having failed to keep sufficient assets to re-insure its outstanding risks, whereby it subjected its charter to forfeiture, under the laws by which it was created.

This state of facts being shown, the defendant moved for a nonsuit upon, among other grounds, the following: that neither the complaint nor the evidence showed facts sufficient to constitute a cause of action; that there was no privity of contract between the plaintiffs and the defendant; nor between the plaintiffs and the Mutual Protection Company; that the defendant did not guarantee the payment of the policy holders of the Widows' & Orphans' Company; that there was no consideration to sustain the promise concerning the contract obligations towards the Widows' & Orphans' Company, or the guaranty signed by the defendant, which would give the plaintiffs a right of action against either; that the promise concerning contract obligations towards the Widows' & Orphans' Company was not made for the benefit of the plaintiffs—or, assuming that the defendant did guarantee the fulfillment of the contract

obligations of that company, the plaintiffs cannot sue in their own names for a breach of such obligation.

The motion was granted ; to which the plaintiffs excepted.

I think the judgment of the court below should be affirmed. The action against the defendant is sought to be maintained on the ground that upon a promise by A., for the benefit of B., which is founded upon a sufficient consideration given to A., B. may maintain an action against A., upon the promise—a doctrine, says ALLEN, J., in *The Ætna National Bank* v. *The Fourth National Bank* (46 N. Y. 268), which was established, although not without a struggle ; " in general," he says, " there has been some trust, or the defendant has been charged as for money which *ex æquo et bono* belonged to the plaintiffs, and a privity of contract has been spelled out ; a doctrine," he adds, that, " will not be extended to new and doubtful cases." He was one of the judges who voted with the majority in the case in which this doctrine was established (*Lawrence* v. *Fox*, 20 N. Y. 268), by a divided court, and in which the judges concurring did not agree upon the grounds upon which they rested their decision ; and in the subsequent cases, the courts are by no means harmonious as to the effect which ought be given to that decision. Thus DENIO, J., who also concurred with the majority in that case, holds in *Burr* v. *Beers* (24 N. Y. 180), that it has definitely settled the broad principle that, if one person makes a promise to another for the benefit of a third person, the third person may maintain an action on the promise. While RAPALLO, J., in *Garnsey* v. *Rogers* (47 N. Y. 240), says : " I do not understand that the case of *Lawrence* v. *Fox* has gone so far as to hold that every promise made by one person to another, from the performance of which a third party would derive a benefit, gives a right of action to such third party, he being privy neither to the contract nor to the consideration. To entitle him to an action on the contract, it must have been made for his benefit. He must be the party intended to be benefited, and all that the case of *Lawrence* v. *Fox* decides, is that where one party borrows money from another upon

his promise to pay it to a third party, to whom the party so lending the money is indebted, the contract thus made by the lender, is made for the benefit of his creditor, and the latter can maintain an action upon it, without proving an express promise to himself from the party receiving the money."

In *Merrill* v. *Green* (55 N. Y. 270), where, upon the dissolution of a firm, one partner took the firm property, giving a bond to the outgoing partner, conditioned for the payment by him of the debts of the firm, the court held that the liability incurred by this bond was to the obligee only, and not to the creditors of the firm; and that an action could not be maintained thereon by a firm creditor, to recover his indebtedness to the firm. It was held that this was no agreement made by the remaining partner with the creditors or for their benefit, but only with the outgoing partner, to exonerate him from his liability for the debts of the firm, which the remaining partner had bound himself to pay; that all the liability incurred was upon the bond, and that that was to the obligee only; whereas in a year after this, in *Claflin* v. *Ostrom* (54 N. Y. 581), it was held by the Commission of Appeal that, where one partner sold out his interest to another who agreed to pay the firm debts, among which was a debt due to the plaintiff, and the defendant guaranteed the performance of this contract, the plaintiff, his debt not having been paid, was entitled to recover it from the defendant in an action on the guaranty, which he had a right to adopt and enforce in his own name. And it has been held or said, in subsequent cases, that the third person need not be privy to the consideration, nor need he be named specifically as the person to whom the money is to be paid (*Secor* v. *Law*, 4 Abb. Ct. App. Dec., 188; *Coster* v. *Mayor &c. of Albany*, 43 N. Y. 411, 412); and although the ultimate beneficiary be uncertain, if the promise is so framed as that he comes within the designation, it is enough (*Simpson* v. *Brown*, 68 N. Y. 360); and that when the third person adopts the acts of the promisee, in obtaining the promise for his benefit, he is brought in

privity with the promisor, and may enforce the promise, as if made directly to himself (*Thorpe* v. *The Keokuk Coal Co.*, 48 N. Y. 257; *Arnold* v. *Nicholls*, 64 N. Y. 119; *Pardee* v. *Treat*, 82 N. Y. 387); and where such a promise is guaranteed, that the party for whose benefit the promise was made, may bring the action directly against the guarantor; that the guaranty goes with the principal obligation, and is enforceable by the same person who could enforce the other (*Claflin* v. *Ostrom, supra*).

The promise, in the present case, which the defendant guaranteed, was a pledge that the contract obligations entered into by the Widows' & Orphans' Company, with its policy holders and others, of every nature and kind, would be rigorously fulfilled to the *same extent* and in the *same manner* as if the change contemplated had not taken place; the words "*to the same extent*" and "*in the same manner*," being especially significant in interpreting the nature of the pledge or agreement contained in the communication. This, the defendant and those who united with him guaranteed, but I do not think that their undertaking can be construed as guaranteeing the payment of all the policies which the Widows' & Orphans' Company had entered into, no matter what might transpire thereafter, either in conducting the business of that company or of the Mutual Protection Company.

As I interpret this passage, it amounts to nothing more than an assurance to the five trustees who were to obtain the amount of stock that would give the Mutual Protection Company a controlling interest in the Widows' & Orphans' Company and the special committee to whom the matter was referred, that the gentlemen who were to take the place of the resigning trustees, and who, being the majority, were to have thereafter the control of the Widows' & Orphans' Company, would, in conducting its affairs thereafter, recognize and fulfill all its pre-existing contract obligations, whether to policy holders or others, and that neither the four gentlemen who guaranteed the fulfillment of all that the Mutual Protection Company submitted and

agreed to in the written communication, nor the five trustees to whom it was addressed, nor the special committee, to whom the subsequent communication was sent, understood or supposed that the four gentlemen who signed this guaranty had bound themselves unqualifiedly and absolutely, under all circumstances, to pay all the policy holders of the Widows' & Orphans' Company, when their policies became due, or what might remain due upon them, if the Widows' & Orphans' Company should thereafter become insolvent, and be unable to pay them; which is what has occurred. It was naturally to be implied that the new trustees who were to come in, and who were to have control thereafter of the company, would fulfill all its existing obligations, as fully as if the company had been continued as it was, or, as the written communication expressed it, " as if no change such as is contemplated should take place." And that this was what was understood and expected, clearly appears by the way in which this clause begins, in these words : " It need hardly be said; but for greater clearness, we say and thereto pledge ourselves," &c.

In *Lawrence* v. *Fox* (*supra*), there could be no question as to what the party sought to be charged was to do; for he was loaned a specific sum of money, with the understanding and agreement, that instead of returning it to the lender, he would on the following day pay it to a person to whom the lender was indebted in that amount; and in the case of *Claflin* v. *Ostrom* (*supra*,) the remaining partner, in consideration of the transfer to him of the firm property, agreed to pay the firm debts mentioned in the written agreement for the dissolution, in which agreement the debt due by the firm to the plaintiffs was named. The court, therefore, held, that in consideration of the transfer of the firm property to him, the defendant had agreed to pay the firm debt, due by it, to the plaintiffs, and that it was an agreement made for their benefit, which, the court held, the plaintiffs could adopt and enforce in their own names, within the principles laid down in *Lawrence* v. *Fox* (*supra*).

In these cases, there was no doubt whatever as to what

the party sought to be charged undertook to do; whereas the present one comes under the head of "new and doubtful cases," in Judge ALLEN's language, "which courts will not bring within the doctrine of *Lawrence* v. *Fox*."

In *Barlow* v. *Meyer* (64 N. Y. 41), the promise upon which the action was brought, was to pay the debts of a firm, without specifying the particular debts, or naming the creditors of the firm; in which respect it was distinguished, in the opinion delivered, from all the cases to which the attention of the court had been called; but the court did not pass upon this point; but, assuming that this did not present a case for the application of the doctrine in *Lawrence* v. *Fox*, the court reversed the judgment, upon another ground: the refusal of the court below to allow a set-off. It was, however, said in this case, as also in the more recent case of *Pardee* v. *Treat* (82 N. Y. 392, 393), that the court was disinclined to extend the doctrine in *Lawrence* v. *Fox*, the court remarking in the latter case that the prior cases of *Turk* v. *Ridye* (41 N. Y. 201); *Hutchings* v. *Minor* (46 N. Y. 456); *Merrill* v. *Green* (55 N. Y. 270); and *Simpson* v. *Brown* (68 N. Y. 356), "exhibit the inclination of the court not to extend its application to new cases." And, in my judgment, it does not apply in the case now before us.

In the six years that elapsed from the time—in 1871—that this agreement was entered into until the dissolution of the two companies in 1877, it may be that all the contracts and obligations of the Widows' & Orphans' Company that became due, were "rigorously fulfilled," in conformity with the assurance that had been given. Their further fulfillment, at the time of the alleged breach, on the 8th of March, 1877, was impossible, as the company was then insolvent, not having sufficient assets at that time to reinsure its outstanding risks. If the change had never taken place, and the company had gone on, as it then was, this fate might have befallen it; for the business of insurance, like any other business, is subject to such a contingency; indeed, under the competition, at the present day, in the

business of insurance, such a fate may overtake any company, under the most prudent and judicious management.

It is very clear to my mind, that no such obligation as an undertaking to make good, in such an event, all the policies which the Widows' & Orphans' Company had entered into when the written communication was sent, was intended to be or was in terms embraced in the guaranty, and the judgment of the court below, in my opinion, should be affirmed.

ALLEN, J., concurred.

Judgment affirmed.