THOMAS F. MASON, as Receiver, etc., Appellant, *v.* JUSTINE M. CRONK, as Administratrix, etc., Respondent.

M., defendant's intestate, as president of the M. P. Life Ins. Co., which company was at the time insolvent, with others of its officers, made a proposition in writing on behalf of their company to buy all the stock of the W. & O. Life Ins. Co., a solvent company, representing that their company was solvent. The proposal contained an agreement on the part of the proposed purchasers to fulfill all the contract obligations of the W. & O. Co. with its policy holders and others " to the same extent and in the same manner as if no change such as is contemplated should take place;" it also contained a guaranty, on the part of M. and his associates, by which, for a consideration expressed, they "individually and collectively " guaranteed the fulfillment of said agreement. The proposal was accepted and the purchase consummated. In an action upon the guaranty, brought by plaintiff as receiver of the W. & O. Co., it appeared that the M. P. Co. borrowed the money necessary to complete the purchase, took the stock and distributed it, putting a majority of its own friends, and among them M. and his associates in the proposal, into the

board of directors of the W. & O. Co. This new board forthwith made
a contract of reinsurance with the M. P. Co., transferred to it in con-
sideration of its agreement to fulfill the contracts of the W. & O. Co.,
its whole reserve which was more than sufficient to protect its policy
holders, taking no security for the performance of the agreement. The
M. P. Co. paid out of such reserve the money borrowed to purchase
the stock. The complaint was dismissed. *Held*, error; that while the
agreement did not guarantee the future solvency of the W. & O.
Co., and a loss from misfortune, error of judgment, the mutations of
business, or the market, would fall upon the policy holders and not be
covered by the guaranty, it was the duty of the new managers of the
W. & O. Co. to keep intact its reserve, and they having by affirmative
and intentional acts put the W. & O. Co. in a position which made
fulfillment of its contracts impossible, the agreement was violated,
the guarantors became liable, and it became the right and duty of the
plaintiff as receiver to turn the guaranty into assets to meet the claims
of creditors.

(Argued January 16, 1891; decided February 24, 1891.)

APPEAL from judgment of the General Term of the Supreme
Court in the first judicial department, entered upon an order
made the first Monday of May, 1889, which affirmed a judg-
ment in favor of defendant entered upon a decision of the
court on trial at Circuit.

This action was brought by the plaintiff as receiver of the
Widows and Orphans' Benefit Life Insurance Company, upon
a guaranty executed by Andrew W. Morgan, defendant's
intestate, and others.

On the 8th of March, 1877, the corporation was dissolved
by a judgment of this court, upon the application of the
attorney-general. Plaintiff claimed to recover the amount
unpaid upon policies of insurance issued by the company.

To maintain the action, a proposal made by him as president
of the Mutual Protection Life Insurance Company, and by the
vice-president and secretary of that company, to the trustees
of the Widows and Orphans' Benefit Life Insurance Company,
on the 5th of March, 1871, was read in evidence. By this
proposal an offer was made to purchase the majority of the
stock of the Widows and Orphans' Company, and substantially
to consolidate it with the Mutual Protection Life Insurance

Company. This proposal to that extent was accepted as a basis for the consolidation of the two companies. The stock to the amount required for this purpose was purchased by the officers of the Mutual Protection Life Insurance Company. A majority of the directors or trustees of the Widows and Orphans' Company resigned, and others selected for that purpose by the Mutual Protection Life Insurance Company were elected as their successors. And in this manner the Widows and Orphans' Company was placed under the control and management of the Mutual Protection Life Insurance Company, which company was at the time of the proposal insolvent. The latter company afterwards transferred its assets to still another company, which finally became insolvent.

In the proposal was this provision:

"It need hardly be said, but for greater clearness we do say, and thereto pledge ourselves, that the contract obligations entered into by the Widows and Orphans' Company with its policy holders and others, of every name and nature, will be rigorously fulfilled to the same extent and in the same manner as if no charge such as is contemplated should take place."

And following the proposal was this guaranty:

"In consideration of one dollar to each of us paid, and for other valuable considerations us thereunto moving, we hereby individually and collectively guarantee the fulfillment of the agreement in the foregoing letter of the Mutual Protection Life Insurance Company."

Further facts are stated in the opinion.

*Raphael J. Moses* for appellant. The judgment of January 17, 1890, after the death of Henry R. Pierson, and before the appointment of his successor, was erroneous. (Code Civ. Pro. §§ 763, 1325. 3263; *Smith* v. *Joyce*, 11 Civ. Pro. Rep. 257; *Gerry* v. *Post*, 13 How. Pr. 121; 2 R. S. 306, § 2; *Griswold* v. *Stewart*, 4 Cow. 45; *Hays* v. *Thomas*, 56 N. Y. 521; *Rogers* v. *Paterson*, 4 Paige, 409; *Vroom* v. *Bitmas*, 5 id. 528; *Nichols* v. *Chapman*, 9 Wend. 455; Code Civ. Pro. §§ 765, 1210, 3347; *Adams* v. *Nellis*, 59 How. Pr. 388,

389; *Herbert* v. *Stevenson,* 3 Dem. 239; *Weyman* v. *N. B. Bank,* 59 How. Pr. 332.) The judgment of the Special Term is void, and the affirmance thereof by the General Term erroneous, as it does not conform to the requirements of section 1022 of the Code of Civil Procedure, in that it is entered merely on an opinion of the court and has no findings to support it. (Code Civ. Pro. § 1008; *Weyman* v. *Nat. Bank,* 59 How. Pr. 332; *Thomas* v. *Tanner,* 14 id. 426; *Putnam* v. *Crombie,* 34 Barb. 232; *Mills* v. *Thursby,* 12 How. Pr. 113; *Van Sheck* v. *Hyatt,* 46 N. Y. 262; *Rogers* v. *Beard,* 20 How. Pr. 282; *Chamberlain* v. *Dempsey,* 9 Bosw. 212; *Loeschigk* v. *Addison,* 3 Robt. 331.) A consolidation must be authorized by the express terms of the statute. (*People* v. *B., H. T. & W. R. R. Co.,* 12 Abb. [N. C.] 230; *People* v. *E. M. Co.,* 92 N. Y. 105; *Abbott* v. *Rubber Co.,* 33 Barb. 398; *R. R. Co.* v. *Allerton,* 18 Wall. 232; Morawetz on Corp. §§ 396, 619–622, 646, 690, 714; *Tuttle* v. *Mu. Air Line Co.,* 35 Mich. 247; *Clearwater* v. *Meredith,* 1 Wall. 25, 40; *Lanman* v. *L. V. R. Co.,* 30 Penn. St. 46; *N. R. Co.* v. *Harris,* 27 Miss. 540, 541; *Stephens* v. *R. Co.,* 29 Vt. 565; *Pearce* v. *Madison Co.,* 21 How. [U. S.] 441.) The transaction was unlawful and beyond the power of the company, because it contemplated the withdrawal of the capital stock. (Laws of 1857, chap. 38; *Graves* v. *Gonge,* 69 N. Y. 154; *Brinkerhoff* v. *Bostwick,* 88 id. 52; *Johnson* v. *Ludeling,* 21 Wall. 616; *Butt* v. *Wood,* 37 N. Y. 317; *C. C. Co.* v. *Sherman,* 30 Barb. 553; *Robinson* v. *Smith,* 3 Paige, 222; *Cunningham* v. *Pell,* 5 id. 637; *Heath* v. *Erie Co.,* 8 Blatchf. 347–394; *Hun* v. *Carey,* 82 N. Y. 65; *French* v. *Rodman,* 17 Hun. 502; *Ogden* v. *Murray,* 79 N. Y. 202; *Austin* v. *Daniels,* 4 Den. 299; *Abbott* v. *R. Co.,* 37 Barb. 578; *R. Co.* v. *Allerton,* 18 Wall. 232.) The plea of the Statute of Limitations is insufficient. (*Black* v. *H. M. L. Ins. Co.,* 47 Hun, 210.)

*P. H. Vernon* for respondent. The judgment of the General Term was properly entered, on January 17, 1890, against the plaintiff, Henry R. Pierson, as receiver etc., although his

death occurred on January 1, 1890. (Code Civ. Pro. § 763.) Plaintiff's alleged cause of action is barred by the Statute of Limitations. (*People* v. *G. M. L. Ins. Co.*, 91 N. Y. 175; *People* v. *E. M. L. Ins. Co.*, 92 id. 105–110; *People* v. *S. L. Ins. & A. Co.*, 78 id. 125; *Lovell* v. *S. L. M. L. Ins. Co.*, 111 U. S. 264; *Black* v. *H. L. Ins. Co.*, 47 Hun, 210.)

FINCH, J. This action is brought upon a guaranty, the construction and obligation of which was settled in the case of *Wise* v. *Morgan* (13 Daly, 402), afterwards affirmed in this court without an opinion. (103 N. Y. 682.) The General Term of the Common Pleas held that the guaranty signed by the defendant did not make him liable absolutely for the payment in full of the policy holders of the Widows and Orphans' Life Insurance Company, or responsible to them for a mere default by that company. It is now claimed that such construction was not necessary to the decision, and so cannot be deemed settled by the affirmance in this court. I think that is a mistaken view of the decision. The action in the Common Pleas was brought by a policy holder in his own name and right against the alleged guarantor, and upon the theory that the latter's promise to the Widows and Orphans' Company was for the plaintiff's benefit, and gave him a right of action within the doctrine of *Lawrence* v. *Fox*. In discussing that question it became necessary to determine exactly what the promise was. The opinion clearly indicates that if it was a guaranty of full payment in any event to the several policy holders, the promise would be so definite and certain and so clearly for the benefit of persons accurately identified, although not by name, as to vest in them a direct right of action. In holding that no such right existed, the court was compelled to measure the meaning and scope of the guaranty, and to decide, as they did, that it involved no such responsibility, but one of a different character, wholly indefinite and uncertain, as it respected the policy holders, and upon which they could found no right of action. That conclusion was affirmed. Looking back at our decision we discover no reason to doubt or recon-

sider it. The guarantors most certainly did not mean, nor were they understood to mean, a guaranty of the future solvency of the company through all chances and changes. The primary purpose of their obligation was to secure the proposed terms of purchase, and, as incidental to that, to assure the sellers that the rights of their policy holders would be respected and protected. It was in that view that the vendees said: "That the contract obligations entered into by the Widows and Orphans' Company with its policy holders and others, of every name and nature, will be rigorously fulfilled to the same extent and in the same manner as if no change, such as is contemplated, should take place." The obvious meaning is that the new management will not undertake to repudiate or dispute the contract obligations of the company, but will respect and fulfill them. They preface their promise with the expression "it is hardly necesssary to say;" language utterly absurd if they meant to guaranty the future solvency of the company as to its policy holders, for if that had been intended it would have been very necessary to say it, and in clear and definite terms, since no law would exact it without the express promise. The further phrases used show that under the changed management there was to be no new or broader liabilty, but only the existing one to be faithfully preserved. We see no reason, therefore, to distrust the construction which we held so confidently as to deem a formal opinion needless.

But it is not the individual policy holder seeking relief through a promise made to another who brings this action, but the representative of the promisee, the receiver of the company to which the promise was made, and the sole question presented is whether that promise has been broken in such manner as to make the guarantors liable for the resultant dam ages. That promise, as we have already construed it, required of the new managers of the Widows and Orphans' Company that they should rigorously fulfill its contract obligations as they would have been fulfilled if no change had taken place. That covenant might be violated in either one of two ways, by a direct or an indirect method. The new managers might

repudiate and dispute the existing contracts with policy holders, and so drive them to their actions for damages; or, by affirmative and intentional acts, put the company in a position which made fulfillment impossible, and so, knowingly or recklessly, defeat the contracts in that manner and by that process. In either event the covenant would be broken, for one who voluntarily puts it out of his power to fulfill his contract violates it as clearly as if he openly disputed or repudiated it. When the guaranty was made the Widows and Orphans' Company was entirely solvent, as it respected its policy holders. It had in safe and undoubted assets more than enough for its reserve, but its capital was impaired about one-half, and was known to be impaired to the extent of $60,000 by the public declaration of the insurance department. At the same date the Mutual Protection Company, of which the decedent was president, was, in fact, insolvent. We have a right to assume that its condition was known to him and to Sanford, the vice-president, and Freeman, the secretary. These three persons, representing their company to be solvent, made, in writing, a proposition in behalf of that company to buy up all the stock of the Widows and Orphans' Company with a view to its absolute control. Although that stock was publicly known to be impaired, they offered for it par in currency and accrued interest in gold, which was then at a premium. The intending purchasers paid one of its directors $25,000, "as an attorney in transacting the business for the Mutual Protection Life Insurance Company, for the purchasers, whoever they might be." Raymond received, also, beyond the price of his stock, about $10,000, and further employment at a salary. Where the money came from we do not actually know, but there was no visible source, unless from the assets of one or the other of the companies.

The purchase proposal ran smoothly to its result, and it undoubtedly helped to pacify the conscience of the sellers that the purchasers formally agreed to fulfill rigorously the contracts of the Widows and Orphans' Company unaffected by the change of owners, and that the decedent guaranteed

that agreement.   The purchase was consummated.   The Mutual Protection Company borrowed the money necessary for the price to be paid, took the stock and distributed it as it pleased, and put a majority of its own friends into the Widows and Orphans' board.   Among these were Morgan, Sanford and Freeman, who were officers of the Mutual Protection and had served as the purchasing committee.   With great prompt- ness this new board made a contract of reinsurance with the Mutual Protection Company, transferred to it in considera- tion of the agreement the whole solid reserve of the Widows and Orphans', amounting to nearly a million and a half of dollars, and took no security for the performance of the agree- ment.   The Mutual Protection Company, out of these trans- ferred assets, paid up the money borrowed to make the purchase, so that the reserve of the Widows and Orphans' was made to pay for the stock of that company, and became at once and inevitably insufficient to meet the obligations ulti- mately to become due to the policy holders, and three men, one of whom was the decedent, knew all the facts and aided in producing the result.   Thereafter both the Mutual Pro- tection Company and the Widows and Orphans' were wound up as insolvent, with resultant losses to the policy holders.

We have held that the contract of an insurance company with its policy holders implies that it will retain its assets in its own possession and continue its business; that if it rein- sures its risks and parts with its reserve its contract is at once broken at the option of the assured; that they may not be turned over to another company without their assent, and are not obliged to pay premiums to the company which has parted with its reserve; and so may treat the contracts as broken and recover damages for the breach, whenever such damages have, in fact, accrued.   (*People* v. *Empire Mut. L. Ins. Co.*, 92 N. Y. 105.)   In the present case the new management broke every contract with their policy holders when they made the agree- ment of reinsurance, and in pursuance of that agreement parted with their entire reserve to an insolvent company, and took in exchange no security whatever for the protection of their

policy holders. The safety of the latter, not at all in peril before the sale, was at once menaced and put in jeopardy, and that by an affirmative and extraordinary act which violated every existing contract with the policy holders. Admitting, as we do, that the future solvency of the Widows and Orphans' Company was not guaranteed; that a loss from misfortune, or error of judgment, or the mutations of business or the market would fall upon the policy holders and not be covered by the guaranty; is it and can it be also true that the new managers could do a positive and affirmative act in violation of every contract with the insured and pour into the coffers of another and insolvent company the very reserve which they were bound to hold for the safety of the assured, and as a consequence ultimately fail in performance, and yet be held to have rigorously fulfilled the contract obligations of the Widows and Orphans' Company to the same extent and in the same manner as if no change of control had occurred? The contracts were to be fulfilled; not broken by a deliberate and voluntary act. It would be a violent assumption for the relief of the defendant to conjecture that if there had been no sale the old board might have reinsured in some bankrupt company, or failed in the end to meet its liabilities. It is enough that the contracts with policy holders were broken and not kept, and that the final breach may be traced back to a positive act, the natural and almost inevitable consequence of which was the loss to policy holders which has occurred. The loss is shown; ample cause for and explanation of it exists in the act established; no other origin or cause is indicated by the proof, and the ordinary inference must follow.

Of course, the company or its receiver could not sue for a breach until some liability to its policy holders accrued on its own part which it was necessary to meet. So long as the policy holders continued to pay their premiums, and thereby exercised their option not to treat the contracts as broken by the transfer of the reserve, and the Mutual Protection Company paid claims as they matured, there could be no right of action by the Widows and Orphans' Company upon the guar-

anty. But when the Mutual Protection Company failed, and the claims of policy holders could not be met by the reinsurer, and the Widows and Orphans' Company also failed and passed into the hands of a receiver, those claims were presented and established, and it became the right and duty of the receiver to turn the guaranty into assets to meet the claims of creditors. His action, therefore, was brought in time, and the only real question at issue is whether upon the facts the deficit in the Widows and Orphans' assets can be fairly traced to the transfer of the reserve by the new board to the Mutual Protection Company. We think it can. The new managers, when they came into office, found the Widows and Orphans' Company with a reserve entirely adequate to meet all contracts with policy holders. That reserve it was their duty to keep and maintain, and if they had done so there is no ground, from any proof in the case, to infer that the policy holders would have suffered a loss. Of course, in its care and management, and in the further transaction of business, that reserve might have become impaired, but the possibility is only a possibility and purely the subject of conjecture, and cannot serve to condone a breach of contract obligations, the immediate and natural result of which was to make performance by the Widows and Orphans' Company according to the contract impossible. Parting with their reserve was a wrongful act as against the policy holders; its immediate consequence was a depletion to the amount of nearly $300,000, against which the transferring company had taken no security or protection; and its own failure may reasonably, and, in the absence of other adequate cause, must be charged to the reckless risk of trusting to the solvency of another company which it could neither manage nor control. There was sufficient evidence to have required such a conclusion by a jury or finding by a court, and it was error to dismiss the complaint without either.

The judgment should be reversed and a new trial granted, costs to abide the event.

All concur, except PECKHAM, J., not sitting.

Judgment reversed.