# THE AMERICAN CASUALTY INSURANCE COMPANY'S CASE.

*Insolvency of Accident Insurance Company—Distribution of Assets— Losses by Policy Holders Before and After Insolvency—Value of Policies—Special Trust Fund for Policy Holders—Creation of Trust—Taxation of Shares of Stock—Liability of Assets of Corporation for Taxes—Wages of Clerks and Employees—Insurance Adjusters—Unearned Premiums—Time of Filing Claims—Interest Thereon—Insuring Carrier Against Liability for Injury to Passenger—Public Policy—Option to Renew Insurance.*

The American Casualty Company, an accident insurance and security company, deposited with the Treasurer of Maryland a sum of money to be held "as a guarantee for the payment of the policies of insurance issued by the company." There was no statute requiring such companies to make deposits with the State Treasurer. Subsequently the company became insolvent and receivers were appointed to whom the said sum was paid under an order of Court. *Held*,

1st. That it was immaterial whether the Treasurer held said fund in his individual or official capacity ; that the same was a special trust fund to be applied solely to the payment of the claims of policy holders and was impress ed with that trust in the hands of the receivers.

2nd. That the provisions of Code, Art. 16, sec. 205, requiring trustees for the benefit of creditors to give bond, do not apply to a trust of this character.

3rd. That the policy holders after having exhausted this special fund are entitled to participate with other creditors in the distribution of the general funds of the company.

4th. That this special trust fund is not chargeable with any part of the costs or commissions incurred in administering the general fund.

In order to create a trust no technical terms are necessary. It is sufficient if the language used shows that the settlor intended to create a trust, and clearly points out the property, the beneficiary and the disposition to be made of the property.

Code, Art. 81, provides that the shares of stock of corporations of this State, owned by residents and by non-residents, shall be assessed for taxation, and that the taxes thereon shall be collected from the corporation, which may charge the same to the account of the shareholders. *Held*,

1st. That such taxes are debts due by the corporation, and are to be paid whether any dividends are payable to the shareholder or not. ·

2nd. That when a corporation becomes insolvent and passes into the hands of receivers, such taxes, if due at the time, are debts for which the assets are liable.

3rd. That such taxes are a prior lien on the assets to be paid out of the general fund, or if that be insufficient, out of the special trust fund above mentioned.

Insurance adjusters not being continuously and solely employed by an insurance company are not employees within the meaning of Code, Art. 47, sec. 15, which provides that when the property of a corporation is taken by a receiver, &c., all moneys due for wages or salaries to clerks, servants or employees, contracted not more than three months prior thereto shall be paid in full.

In the distribution of the assets of this insolvent insurance company, where there was a special fund held in trust for the policy holders and also a general fund, *Held*, that the wages and salaries of clerks, servants and employees for three months before the insolvency, were preferred claims against the general fund only, and under no circumstances were to be paid out of the special trust fund.

Some of the policies issued by the Casualty Co. stipulated to indemnify the assured (mostly railway and other corporations) against liability for damages for injuries caused by the assured to property, or to employees, or passengers, or to strangers, for which injuries the assured might be legally liable. The insurer's liability was measured by the amount actually paid by the assured to the person injured, or the representative of the person killed, or the owners of property destroyed or damaged. At the time of the insolvency of the company, some of the assured had incurred liability for injuries by the happening of events insured against, but the exact amounts of the liabilities had not been fixed. Other casualties for which the various assured corporations held policies happened after the insolvency of the insurer, which was taken to be the day of the appointment of the receivers. *Held*,

1st. That the insolvency of the company cancelled all outstanding policies for the future, and consequently losses which occurred after the insolvency under policies then in existence are not provable against the funds in the receiver's hands, but the holders of such policies are entitled to prove for the value of the same, which consists solely of the unearned or return premium.

2nd. That where the accident or injury insured against occurred and the damages were ascertained and paid by the assured before the appointment of the receivers, the policy holders are entitled to prove for the loss and for the unearned premium.

3rd. That when the accident or injury insured against happened before

the appointment of the receivers, but the amount recoverable by the party injured from the assured was not ascertained and paid until after that date, the assured is also entitled to prove for a sum equal to the damages paid by him plus the return premium.    In such case the contingent liability of the insurer became a fixed liability the moment an event happened which fastened a responsibility insured against upon the assured, although the amount of the liability was not then ascertained.

4th.  That although there are outstanding claims against policy holders where the amounts have not yet been ascertained, yet the settlement of the company's affairs ought not to be postponed to await the determination of every contingency, and consequently the Court should order all claims to be filed by a certain day, or otherwise be barred from participation in the distribution.

5th.  That no interest should be allowed on any of the claims against the company.

Some of the policies issued by the Casualty Company indemnified common carriers against liability for injuries to passengers and employees.  *Held*, that such contracts were not void because against public policy.

While a common carrier cannot stipulate for exemption from liability for injury to passengers caused by its own negligence, there is no reason of public policy which prohibits it from contracting with a third person for insurance against these same losses.  Such insurance does not diminish the carrier's own responsibility to the passenger, but increases his means of meeting that responsibility; nor does such insurance tend to relax the carrier's vilgilance and care.

One of the assured held a policy expiring August 1, 1892, which contained an option allowing it to renew the same for three years more.  The assured gave notice of its desire to renew but the insurer refused to renew.   The renewal premium was not tendered.   *Held*, that the policy ceased to be in effect after August 1, 1892.

Appeals by the Boston and Albany Railroad Company and nineteen other parties from an order of the Circuit Court of Baltimore City, distributing the funds of the American Casualty Insurance and Security Company among its creditors, according to certain priorities established by that order.

On November 23, 1893, Isaac R. Trimble and other creditors filed a bill in the Court below alleging that the Casualty Company "is now indebted to various persons in many parts of the United States for claims against the de-

fendant for losses under the terms of various policies of insurance issued by it to an amount exceeding the sum of five hundred thousand dollars, and that it is unable to pay the same, being unable to realize upon its assets in time to meet such payments, and in that sense the defendant is insolvent; that it has become impossible for the defendant to conduct its business any longer, and that by reason of its assets being scattered in a number of different States, and by reason of the eagerness of its creditors to obtain priorities, if possible, both in those States as well as in the State of Maryland, the defendant will be exposed to litigation of a ruinous character, which will dissipate its assets and prevent an equitable distribution thereof among its creditors, unless this Honorable Court shall, for the general and equal benefit of all the creditors and stockholders of the defendant, assume the control thereof, and cause its assets to be realized and distributed under its orders."

The bill prayed for the administration of the assets of the company under the superintendence of the Court and the appointment of receivers.   On the same day the defendant answered admitting the averments of the bill, and the Mercantile Trust and Deposit Company of Baltimore and E. Austen were appointed receivers.   Upon the death of Austen soon afterwards, D. K. Este Fisher was appointed coreceiver.   The facts are stated in the opinion of the Court.

Some of policies issued by the Casualty Company provided for indemnity as follows: "Against all liability of the assured for damages on account of the personal injury or death of the employees of the assured, resulting from any and every accident, happening to them upon the above described premises, or elsewhere while in the service of the assured.   But the company's liability in respect to any one employee, whether injured or killed, or both, shall not exceed $————."   Also, "against all liability of the assured for damages on account of the personal injury or death of any person whomsoever, other than the assured's employees, resulting from any and every acccident happening on or

about the above described premises, or caused by any of the horses or vehicles owned by the assured, and enumerated in the application herefor, wherever they may be, while used in the active business of the assured.    But the company's liability in respect of any one person whether injured or killed, or both, shall not exceed $———."

The Court below (WRIGHT, J.), passed an order on August 8, 1895, determining the rights of creditors who had filed claims and directing the auditor to state an account in accordance with such determination.    By this order it was also adjudged, "that each owner or holder of or person having any lawful claim upon any of said classes of insurance policies or any other similar policy of the defendant corporation, issued prior to November 23rd, 1893, for a period to extend beyond said date, who duly paid the premium thereon for the entire period or any portion of it extending after November 23rd, 1893, as agreed between the policy holder and the said company, is entitled to claim upon the value thereof on November 23rd, 1893, and to receive dividends upon such value out of the net *special* fund.

" And it was also adjudged and ordered, that the values of said policies and security bonds are as follows:    1st. Where no loss had occurred prior to November 23rd, 1893, the value of the policy is the return premium, that is to say, that proportionate part of the entire premium paid which covered the time extending from November 23rd, 1893, to the date upon which the policy was written to expire.

" 2nd.    Where the claimant had, prior to November 23rd, 1893, sustained any loss against which the defendant corporation by the terms of the policy upon which said claim is made agreed to indemnify the claimant, the value of the policy is subject to the limitations, conditions and stipulations thereof, a sum of money equal to the sum of the loss and the return premium as above defined.    But no cause of action, nor action nor suit pending against the claimant, nor judgment, nor decree against the claimant unsatisfied before

November 23rd, 1893, by the claimant, is a loss sustained by the claimant, nor can any claim be made on any judgment or decree rendered against the claimant and satisfied by him prior to November 23rd, 1893, except for the amount actually paid in settlement thereof.

" 3rd. Where the claim is upon an individual accident policy, if the claimant suffered such injuries prior to November 23rd, 1893, as are embraced within the terms of the policy, the value of the policy is subject to the conditions, limitations and stipulations thereof, a sum of money equal to the return premium as above defined, added to the amount of weekly indemnity as agreed by the terms of the policy to be paid from the date of the injury to November 23rd, 1893, or to the date of recovery from such injuries, if recovery was complete within the meaning of the policy before the 23rd of November, 1893. And if the injury resulted in death, or in the loss of both hands, both feet or both eyes, as described in the policy prior to November 23rd, 1893, and within 90 days of the injury, the value of the policy is subject to the conditions, limitations and stipulations of the policy, the principal sum of the policy, and if. death, or such loss of hands, feet or eyes, occurred before November 23rd, 1893, but more than 90 days and less than fifty-two weeks after the injury, the value of the policy is subject to the conditions, limitations and stipulations thereof, the return premium added to the weekly indemnity to the death, if death occurred, or until the expiration of fifty-two consecutive weeks from the date of the accident, if they expired on or before November 23rd, 1893, or until said date last mentioned, if said fifty-two weeks extended beyond said date, if such loss of feet, hands or eyes occurred. And if the injury resulted in the loss of one hand, foot or eye, as described in the policy, within ninety days of the accident and prior to November 23rd, 1893, the value of the policy is subject to the conditions, limitations and stipulations thereof, one-half of the principal sum mentioned in the poltcy.

" 4th. No loss which occurred upon any policy or security bond after November 23rd, 1893, gives rise to a lawful claim against the assets of the defendant corporation."

The causes were argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE, PAGE, ROBERTS and BOYD, JJ.

*Bernard Carter* and *Charles J. Bonaparte* for the Boston and Albany Railroad Company, and other appellants.

The order of the Court below enumerates the several classes of policies issued by the insolvent corporation while engaged in business. This enumeration is not quite exhaustive, and it will be found that policies in other forms were issued by the said insolvent corporation, of which various specimens have been inserted by agreement in the record. Without, however, making any distinction between the different kinds of policies enumerated, the order next defines the rights of the several policy-holders to participate in "the net special fund," and it adjudges that: "Each owner and holder of or person having any lawful claim upon any of the said classes of insurance policies or any other similar policy of the defendant corporation, issued prior to November 23, 1898, for a period to extend beyond said date, who duly paid the premium thereon for the entire period or any portion of it extending after November 23, 1893, as agreed between the said policy-holder and the said company, is entitled to claim upon the value thereof on November 23, 1893, and to receive dividends upon such value."

It is respectfully submitted that this adjudication is erroneous in the following respects: First. In limiting the claims against the special fund to policy-holders whose policies had been issued for a period to extend beyond November 23rd. This, apparently, excludes, as against the special fund, the claims of a policy-holder, upon a policy which expired on or before November 23rd, for unsettled losses occurring during the continuance of the policy. As will be

hereafter explained, this was a contingency very likely to arise in view of the peculiar character of the insurance provided by this particular corporation.  Second. In restricting the right to share in the fund to a policy-holder, who had paid a premium for some period of time extending beyond November 23, 1893, which, practically, amounts to establishing the same distinction between holders of policies in force on the last mentioned date, and holders of policies not then in force, but under which claims had accrued and remained unsettled.  Third. In fixing "the value of the policy," on November 23, 1893, as the basis on which dividends were to be allowed to policy-holders out of the special fund.  This expression, it is respectfully submitted, is, at least, misleading; since, although in one sense, the *value* of the policy at the date of insolvency might be accurately described as the amount on which the policy-holder was entitled to dividends, yet, as this "value" might be shown to be a very different sum at the time when the auditor's account was stated from what it appeared to be at the time of the appointment of the receivers, the expression is calculated to confuse the auditor as to the discharge of his duties.  It is, however, perfectly clear from the further provisions of the order that in this instance the expression in question is used in a sense distinctly erroneous.  These appellants therefore respectfully ask that this portion of the order appealed from be reversed.

In view of the circumstances under which the fund of $200,000 was deposited with the Treasurers of the State, it is submitted : " First. That each of the two deposits made by the insolvent corporation with the successive Treasurers constituted, in the view of a Court of Equity, perfected trusts for the purposes stated in the two certificates, *i. e.*, "as a guarantee for the payment of the policies of insurance issued by said company."  *Lloyd* v. *Brooks*, 34 Md. 27. Second. That the company having created these trusts " in order to strengthen itself" or, in other words, to induce persons to take out policies and pay premiums on the faith·

of such guarantee, and, presumably, having thereby in-
creased the volume of its business and the amount of its
general assets, it and any one claiming under it, whether as
receiver, general creditor or otherwise, would be estopped
to deny the validity of the trust, even if this could be im-
peached.  *Pollard* v. *Mohler*, 55 Md. 284.  Third. That
the decree of December 12, 1893, having become enrolled
when the term at which it was passed elapsed, the rights of
all parties were determined by its declaration that the stock
in question or its proceeds, if sold, should be held by the
receivers "for the benefit of the policy-holders of the defen-
dant corporation."   *Trayhern* v. *National Mechanics' Bank*,
57 Md. 598.   Fourth. That all such parties, and those in
privity with them, are, moreover, estopped to question any
material fact in issue in the proceeding in which such a de-
cree was passed.  *Keene and Brady* v. *Van Reuth*, 48 Md.
184.   For these, and other reasons, it is submitted that the
propriety of so much of the order of August 8th as recog-
nizes the special fund cannot be successfully assailed.  *Mil-
ler's Appeal*, 35 Pa. St. 481 ; *Atty. Gen.* v. *N. A. L. I. Co.*,
82 N. Y. 186; *Burden* v. *Mass. S. F. Ass.*, 147 Mass. 368.

It is obvious that a certain length of time must always
elapse between the occurrence of an accident covered by a
policy, and the presentation of a claim against the insolvent
corporation in such shape as to be payable under its terms ;
that usually this period of time would last weeks, and even
months, and that it might be frequently protracted for con-
siderably more than a year.   It is also clear that, as soon
as a claim was made upon the assured, it became probable,
and as soon as legal proceedings were commenced by the
claimant, it became certain, that the insuring company would
become, sooner or later, liable to pay *something* under the
policy, but that *what* it would be thus called upon to pay
would remain altogether uncertain, *ex necessitate rei*, until
the suit had progressed to final judgment, and all costs,
counsel fees and other expenses connected with it had been
paid.

Finally, it is evident that, as soon as the insurance com-
pany ceased to do business, and its assets passed into the
hands of receivers, a breach of contract occurred at once
on every outstanding policy, since it became unable to
longer perform the duty imposed upon it by its contracts, of
defending or adjusting the suits brought against its policy-
holders.   This fact was recognized by the Court in several
orders passed upon the petitions of the appellees on Decem-
ber 11 and 21, 1893, and January 17, 1894, by the last of
which it is provided that the policy-holders should be re-
lieved from the provision of their policies forbidding them
to interfere with the defence of claims, actions or suits
against them, or to make any adjustment or settlement of
these; and this order concludes by directing that, when
these claims against policy-holders have been paid by them
after adjustment or judgment, "The same, together with
the attorneys' fees, Court costs and expenses, which may
have been incident and necessary to the assumption by the
policy-holders respectively of the control of such suits, ac-
tions and claims, and the defence or settlement thereof, and
which shall have been fairly and justly paid by such policy-
holders respectively, may be established and asserted in
this proceeding for the purpose of sharing in the distribution
of the assets, with the same rights as they would have in
actions or suits brought against the defendant corporation
by them respectively for that purpose."

It is evident that at this time neither the receivers nor the
Court entertained any doubt whatever that claims against
the funds in the hands of the former would arise on the
part of policy-holders from suits pending against them at
the date of insolvency, or which might be instituted after
that date.

When, however, the order of August 8th, last, was pre-
pared by the receivers, and passed by the Court, their view
of this matter was radically different, and the order, as has
been pointed out above, denies the right of any policy-
holder to participate in the special fund, except in obtaining

therefrom a partial repayment of premium for the period during which he had paid for, but not enjoyed, the benefit of insurance, unless and beyond the extent that he had *actually paid* before the insolvency of the defendant corporation, as established by the appointment of the receivers, claims provable by him under its policy, and, as we have also noted *supra* the order requires likewise that such policy should have been "issued prior to November 23, 1893," (the date last aforesaid) "for a period to extend beyond said date." It is respectfully submitted that no authority can be found for either of these restrictions, and that they are alike, indefensible upon principles of equity.

The effect of insolvency upon contracts of insurance is to cancel them *for the future.* *Dewey* v. *Davis*, 82 Wis. 503 ; *Davis* v. *Shearer*, 62 N. W. R. 1050. Therefore, as soon as the insolvency of the American Casualty Insurance and Security Company of Baltimore City was judicially established by the decree appointing receivers, every holder of an existing policy had a claim to have that portion of his premium returned to him, which he had already paid for a period to extend beyond the date of insolvency. With the premium thus returned he could in presumption of law secure new insurance for the period of time aforesaid, and it was merely his misfortune, one shared with all the other creditors of the insolvent corporation, if he failed to receive the full amount of this debt, and had to wait a long time before receiving anything.

This principle is recognized in the order appealed from, but the receivers and the Circuit Court seem to have assumed, that because only the holder of a policy in force at the time of insolvency, and who had paid a premium for a period extending beyond that date, should have any claim *for a return of premium*, the holder of a policy *not* then in force would have *no claim* against the special fund *at all*. This assumption, however, is absolutely unwarranted. There is nothing in the language of the deposit with the Treasurer of the State, or in that of a decree of December 12, 1893,

or in the principles of law, which restricts the benefit of the security held by the Treasurer to policy-holders, whose policies shall be in force at any particular date. As has been already noted, the use of the term " value of the policy" in the order is, in this case, misleading. The securities were decreed to be held by the receivers not to *redeem* or *cancel outstanding policies* of the insolvent corporation, but "for the benefit of the policy-holders of the defendant corporation," that is to say, for the benefit of *all* such policy-holders, or in other words, for the payment of all claims of policy-holders *as such;* and it would have been clearly erroneous for the Court to have passed a decree in any other terms in the case (even if the propriety of the decree were now open to question), since the securities in question were described by the trustee in his declaration of trust as " held by me in trust for the policy-holders," so that all the policy-holders of the insolvent corporation were *cesteux que trustent. U. S. F. & M. I. Co.* v. *Tardy*, 2 Ins. L. J. 672; *Guy* v. *Globe Ins. Co.*, 9 Ins. L. A. 466; *Atty. Gen.* v. *N. A. L. I. Co.*, 82 N. Y. 173.

The same error appears to underlie the other provisions of the decree. The policies were issued to assure a certain kind of indemnity to their holders. The securities were held by the trustee "as a guarantee for the payment of the policies of insurance issued by said company," therefore, the duty of the trustee was clearly to use the fund to pay all claims covered by this indemnity, so far as this was necessary to satisfy the contracts of insurance made by the insolvent corporation with its policy-holders. In so far as these contracts related to a time after the insolvency, they were abrogated by the law, and his obligation would be fulfilled when he repaid the policy-holders the amounts of the unearned premiums; but for the consequences of accidents which had occurred prior to the insolvency, such repayment would in no manner comply with the terms of the contract of insurance. The policy-holder obviously could not reinsure against *these* losses. Whilst it is true that there

are very few decisions touching the rights of the creditors of casualty insurance companies to share in their assets after insolvency, no reason seems to exist why the general principle of equity, well recognized in cases of fire, marine and life insurance, that the interest of the policy-holder is, so far as possible, *the equivalent of the consideration for which he paid his premium*, should not apply in such a case. *People* v. *Security Life Insurance and Annuity Company*, 78 N. Y. 114 ; *Holdich's case*, L. R. 14 Eq. 72 ; *Carr* v. *Hamilton*, 129 U. S. 252 ; *Universal L. I. Co.* v. *Binsford*, 76 Va. 110 ; *Smith* v. *Charter Oak L. I. Co.*, 5 Big. L. & A. Ins. Rep. 214. It is, therefore, submitted that, for the consequences of any accidents which occurred before the insolvency of the corporation, every policy-holder has a claim, whether these consequences had or had not at that date taken the shape of a payment of money by him. The case is strictly analogous to that of a fire insurance company, where a fire occurred on the day before receivers were appointed. The amount of the loss as subsequently ascertained under the terms of the policy, would in such a case clearly be provable against the assets. *Commonwealth* v. *Mut. Ins. Co.*, 112 Mass. 116.

We submit that that portion of the order of Aug. 8, 1895, which adjudges that the claims of. clerks, messengers, stenographers and typewriters (which by said order are determined to be the preferred class contemplated by section 15, of Art. 47) for wages or salaries accrued within three months before Nov. 23, 1893, should be paid out of the special fund in case the general fund is not sufficient for this purpose, is erroneous, and should be reversed. 1. We submit that it could not have been the intention of the legislation embodied in section 15 of the Code, to devote to the payment of the wages or salary of the persons therein mentioned, property which, during their employment, had been expressly declared should be clothed with a specific trust, and applicable only to the claims of certain specified individuals. Certain it is that if their salaries or wages had

been unjustly withheld while the company was in the management of its president and directors, and they had recovered judgment and issued execution, they could have had no right to have this special fund taken in execution; why should they have any better right to be paid out of this fund after the company goes into the hands of receivers.    2. Moreover, we respectfully submit that although the 15th section of Article 47 of the Code declares that in the distribution of the property or estate of the corporation, the claims of the persons mentioned in said section shall be preference claims against said property or estate, yet the property or estate here referred to, must mean that to which the corporation has an apparent title, as its own property; and can have no application to the $200,000, which, contemporaneously with its deposit in the hands of the Treasurer of the State, was validly and definitely deposited with him to be held in trust for specially described persons. The deposit made with the Treasurer by the company is a trust just as efficaciously created in favor of the policy-holders of the company, as if the deposit had been made in favor of certain particular policy-holders, describing them by name.    By this deposit, therefore, the $200,000 of stock had become specifically charged with a lien in favor of the policy-holders, and the company could not remove it from the hands of the Treasurer without their consent, until all claims on the part of such policy-holders had been satisfied. The Treasurer was trustee, holding this stock, personal property, in trust for specifically described *cestui que trusts*; it was, therefore, a perfectly constituted trust, the legal title being in the Treasurer and the equitable title in the policy-holders, the company having no right in the said stock until the purposes of the trust had been accomplished.

*Thomas G. Hayes, City Counsellor,* for the Mayor and City Council of Baltimore, one of the appellants.

On the 28th May, 1895, the Mayor and City Council of Baltimore filed its petition in the pending case in which the

receivers had been appointed, claiming that it was entitled to a priority in payment of said taxes out of the assets or property of the corporation already collected by the receivers over all other creditors.    In its petition the city avers: " 3.  That one hundred and seven shares of the stock of said corporation were, during the year 1893, held and owned by residents of Baltimore City, and 9,588 shares were, during said year, held and owned by non-residents of the State of Maryland.   4.  That said 9,695 shares of the stock of said corporation was duly assessed by the State Tax Commissioner for the year 1893, at $53.05 per share, making in the aggregate an assessment of $514,319.75 upon the shares of stock held and owned by residents of the city of Baltimore and by non-residents of the State of Maryland.  Upon which assessment there was duly levied for the year 1893, by the Mayor and City Council of Baltimore, for its municipal taxes, the sum of $7,971.96 which, with interest and costs thereon up to the present time, amounted to the sum of $9,040.19."

The statute law of Maryland has, by its express provisions, declared that the body corporate and its property and assets shall be alone the debtor to which the city and State shall look for the payment of the shareholders' contribution for governmental support, and not the shareholders.    It is submitted that these provisions of law make the corporation solely liable for the taxes assessed on the shares of its stockholders.    It is the property or assets of the corporation alone which the city must look to for the payment of these taxes.    The city has no legal right to enforce the payment of these taxes against the individual shareholder, because the law has said it is the corporation which must pay.  This very property of the corporation, whether it be " furniture, city stock, U. S. bonds or Danville securities," which is to-day, as appears from their report, in the possession of the receivers in this case, are the same assets or property which the city would have seized for the payment of these very taxes but for the intervention of the Circuit Court of Balti-

more City and the appointment of these appellees, receivers. How, then, can it be successfully maintained that this property, which was by law liable to the payment of these taxes when converted into money or passed to the receivers, is no longer liable? *New Orleans* v. *Houston*, 119 U. S. 265; *Nat. Bank* v. *Kentucky*, 9 Wall. 353; *Am. Coal Co.* v. *Allegany Co.*, 59 Md. 197; *Central Trust Co.* v. *Railroad Co.*, 110 N. Y. 258.

*Edgar G. Miller, Jr.* (with whom was *Leigh Bonsal* on the brief), for J. C. Paige, appellant.

This appeal is taken by John C. Paige, a general creditor of the American Casualty Insurance and Security Company. The appellant is one of " Class 3 " as defined in the order of the Court below, not being an employee, &c., nor a policy-holder. He has duly proven and filed his claim for upwards of $30,000 for services rendered as general manager of the corporation for several New England States. The purpose of the appeal is to urge the reversal of the decretal order of August 8, 1895, in so far as the order adjudges that the fund invested in $200,000 of Baltimore City stock (and the interest thereon as collected), " constitutes a special fund applicable solely to the payment of claims of all the policy-holders of the defendant corporation for the values of their policies," &c. The order denies to the appellant the right to participate in this fund and compels him to look only to the so-called " general fund " for payment of his claim, the result of which would be that the appellant would lose almost the entire $30,000 now due to him. The appellant contends that the $200,000 is a part of the general assets of the corporation, and is subject to the claims of all creditors, whether policy-holders or otherwise.

The reasons for this view are as follows : 1. The deposit of $200,000 remained the property of the corporation and no trust estate was created, because certain essential elements in the creation of a trust were absent; and 2. Even if there might otherwise be a trust estate, no title passed to

the trustee, because of the failure to record a proper instrument creating the trust, and because no bond was given. Code, Art. 16, sec. 205 ; Acts of 1892, ch. 241.

When the first receivers took possession of the assets of the company they knew or soon learned of the deposit with Mr. Jones, and of the nature of the transaction.   What then was the action of the receivers in respect to this deposit?   On November 23, 1893, they filed their petition, reciting the facts in regard to the deposit, and stating that it was then in the hands of Mr. Jones.   In this petition they stated that the corporation made the deposit in order to " strengthen itself," and that the securities " are the property of the defendant corporation."   Here there is a distinct denial of the existence of a trust ; for it is, of course, impossible that the securities should be the property of the corporation and at the same time be validly conveyed away by a trust for policy-holders.   Indeed, the receivers could not have obtained possession of the securities except on the theory that no trust estate existed.   For, as stated above, if there was a trust estate for the benefit of policy-holders the corporation must have parted with all dominion over it and ownership of it.   Why should the receivers obtain possession of a fund that belonged exclusively to other parties, and in which the corporation had no interest whatever ? Without this allegation, which was made, that the securities " are the property of the defendant corporation," the Court below could not have ordered them to be delivered to the receivers ; and yet this very allegation, necessary to enable the receivers of the corporation to get the property, disproves the theory that the property had been conveyed away by a trust.   The receivers show that the securities are the property of the corporation ; but the decree we appeal from declares in effect that they did not belong to the corporation, but had been conveyed away by the corporation to a trustee for certain creditors.

  If a valid trust estate had been created, the order of December 12, 1893, was clearly erroneous in taking the fund

out of the hands of the trustee and placing it in the hands
of the receivers.    The trustee was the only one entitled to
the possession of the trust estate, and he was accountable
only to the *cestuis*, who were not parties to the case at the
time.    That the trustee should retire from the trusteeship
and hand over the fund to the receivers, to be expended
partly in costs and fees without any notice to the *cestuis*,
was a clear violation of the trust.    This conclusion would
seem to need no argument and require no authority.    Yet
in those States where statutes require a deposit by insur-
ance corporations with a State officer as a statutory trustee
there have been express decisions to this effect.    Thus it is
held that as the State Treasurer holds the property as trus-
tee, *he* must distribute the funds among the persons entitled
to them, and that the Court has no power to authorize or
direct the withdrawal of securities from the trustee upon
any terms or conditions whatever; and that the funds can-
not be handed over to the receivers of the corporation.
*Cooke* v. *Warren*, 56 Conn. 234, 239, 240; *Falkenbach* v.
*Patterson*, 43 Ohio St., 359, 369; *Lancashire Ins. Co.* v.
*Maxwell*, 131 N. Y. 286, 292; *Atty.-Gen.* v. *North Am.
Co.*, 80 N. Y. 152.

*A. H. Robertson*, for P. W. Ward and others, appellants.

Is an adjuster of the Casualty Company entitled to
priority for salary and expenses under Code, Article 47,
sec. 15.  The company took charge of each case, as the ac-
cident occurred, and stood in the place and stead of the
insured.   Just as in any general line of insurance, the loss,
if any, had to be adjusted, so that a corps of experienced
clerks, employees or servants in this line of business, had
to be employed at stated salaries, to ascertain the liability
of the company, and to gather the data upon which a set-
tlement or adjustment could be made.    They were the
clerks, servants or employees of the company, performing
duties involving the immediate and necessary objects of its
business.    Without these adjusters the company could not

have carried on the business it was chartered to perform.
It is apparent, then, that such services as are rendered by
an adjuster fall within the duties of a clerk, servant or
employee.

It was held in the case of *Hand* v. *Cole*, 88 Tenn. 409,
that although such a statute should be strictly construed,
that a traveling salesman or drummer came within the pro-
·tection of the State.    In *Harris* v. *Norvell*, 1 Abb. N. C.
127, it was held under stockholders' liability, that a reporter
employed by a newspaper company, and a city or assistant
editor, if not an officer of the company, to be a servant.
Under statute of N. Y., making stockholders liable for
"wages" of a "servant," it was held that an overseer and
bookkeeper were within its meaning.    *Hovey* v. *Ten Brock*,
3 Robertson, 316.    Under a statute of Indiana, giving a .
preference to laborers or employees, a superintendent of
labor was held to be protected.    *Pendergast* v. *Yandes*, 24
N. E. Rep. 724.

*J. Aspinwall Hodge, Jr.*, (with whom were *Joseph B. Seth*
and *H. E. Mann* on the brief), for the Young Women's
Christian Association and other appellants.

One paramount question, if passed upon on this appeal,
will necessarily determine forever the rights of claimants
holding upwards of a million dollars of claims.    This ques-
tion is one which is more or less novel, and, so far as counsel
are aware, has never been directly passed upon by any Court
in the United States.    It concerns the validity of the con-
tracts of insurance between policy-holders who are common
carriers of passengers and the insurance company which
insured or attempted to insure them against their negligence
or other tortious or criminal act, and agreed to indemnify
them against all loss or damage which they might suffer
by reason of their negligence, or the negligence of their
employes in causing damage to life and limb.

A *priori*, any contract which relieves a common carrier of
its duty to the public, or of its liability for all or any of the

wilful, criminal and negligent acts of its employees, of its
managers and directors, and of itself, is manifestly "detri-
"mental to the interests of the public as understood" by
the Courts in this year, 1895. These contracts must fall
under the definition of agreements against public policy,
and "it is sufficient that this tendency is shown, and we
have not to wait for the appearance of detrimental re-
sults." The record in the case, however, inferentially
shows that detrimental results exist, and have been caused
by the issuance of just such policies.

. If it is against public policy for a common carrier of pas-
sengers to contract with A that it shall be relieved from all
liability because of injuries to A, is it not, for precisely the
same reasons, contrary to public policy for a common car-
rier of passengers to contract with B that he shall be relieved
from all liability arising out of its own negligence, or the
negligence of its servants, which may cause injuries to A.
The only proper rejoinder to this question is that there is
no difference. If it is contended that there is a difference,
by reason of the fact that money is paid to B for his con-
tract of indemnity (B representing the insurance company),
the reply is that money or other valuable consideration is
oftentimes paid to A for the same reason, and under the
decisions, is held still to be against public policy, and further,
payment having once been made to B covering all accidents
and a long period, the effect upon the railroad company is
precisely the same as if the release from liability had been
obtained in some other way. The reason for the law is the
exacting of the utmost diligence and fidelity. It is this that
underlies the law. It is the fundamental principle upon
which the law of common carriers is founded. "The great
object of the law was to secure the utmost care and dili-
gence in the performance of their common duties—an object
essential to the welfare of every civilized community." The
policy of the company may run for a year or it may run for
a much longer time. In either event, for the period cov-
ered by it, the diligence of the common carrier is relaxed

precisely as if it made a contract with each and every passenger, with each and every employee in its service and with the great general public, if that were possible, relieving them from all liability, from all penalty from the non-exercise of due and proper care, from all criminal acts as well as negligent ones, and from all the acts of itself and its officers as well as from all the acts of its servants and agents.

A case in the Supreme Court and cases following it in other Courts will be cited against the appellant's contention. There it is *held* that a common carrier *of goods* may insure against its own negligence without contravening public policy. *Phœnix Ins. Co.* v. *Erie Co.*, 117 U. S. 312.

Admitting this to be sound law, the argument urged against us takes this form: It is admitted that: A.—A contract by a common carrier of goods, relieving itself of liability for its negligence, is against public policy.    B.—A contract by a common carrier of passengers relieving itself of liability for its negligence, is against public policy.  C.—A common carrier of goods may insure against its negligence. Therefore: D.—A common carrier of passengers may insure against its negligence.

This is a *non sequitur.*   To make the argument complete, it should be shown that the reason or reasons for proposition A, is or are the same as for proposition B.   Now, they are not the same, or rather, they have one reason in common and one reason which applies only to proposition B.

*Frederick W. Brune* (with whom was *Arthur George Brown* on the brief), for Peet Bros. Manufacturing Co. and Charles B. Hurley, Receiver.

*John L. G. Lee* (with whom were *Cowen, Cross* and *Bond* on the brief), for the San Antonio and Aransas Pass Railway Co. and others, appellants.

*Richard S. Culbreth* (with whom was *Paul Burnett* on the brief), for George P. Furber and other adjusters employed by the Casualty Co.

*Sylvan Hayes Lauchheimer* filed briefs for B. F. Bennett, Bartlett, Hayward & Co. and the Baltimore and Curtis Bay Ry. Co., appellants.

*Thomas R. Clendinen* and *Edward C. Carrington* filed a brief for J. H. Vonderhorst & Son, appellants.

*William A. Fisher* for the Receivers.

It is a right of a policy-holder of an insurance company during the period for which he is insured, that the company shall continue solvent and able to pay losses on the policy. *Mason, Receiver,* v. *Crouch,* 125 N. Y. 503; *People* v. *Empire Life Ins. Co.,* 92 N. Y. 108. And when an insurance company becomes insolvent and unable to meet its obligations on its policies, its contracts represented thereby are broken, and the policy-holders thereupon become claimants for *damages,* and the damages are the *values* of their policies destroyed. Preceding cases and also *People* v. *Security Life Ins., Co.,* 78 N. Y. 125; *Smith* v. *Charter Oak L. I. Co.,* 5 Big. Life and Acci. Rep. 214; *Smith* v. *St. Louis M. Life Ins. Co.,* 2 Tennessee, ch. 740–1. Furthermore, the values of the policies are *not their values at some future date, but on the date when the corporation parted with control of its assets.* This is illustrated by an ordinary assignment for the benefit of creditors. In such case the insolvent debtor and his assets are no longer identified—they have parted company. The creditors are not prevented from pursuing the debtor; they may sue him and recover judgments against him, and hold them over him as long as he lives until they are paid in full, unless he is discharged in insolvency, but as to the assets assigned, their rights become fixed at the date of the assignment. From that date the assets belong to the creditors in equity, and they are owners of them in proportion to their respective claims at the date of the assignment, and are entitled to dividends thereon according to their values, calculated as of the date of the assignment. *Miller's Appeal,* 35 Pa. St. 481; *Smith* v. *Charter Oak Life Ins. Co., supra.*

And the same is the case where possession of the prop-
erty of an insurance company is taken by the Court by
receivers, especially where the property is assigned to them.
*Carr* v. *Hamilton*, 129 U. S. 256–260, and bottom of page
259 and top page 260; *Atty. Gen'l* v. *North American L. I.
Co.*, 82 N. Y. 186, last half; *Burden* v. *Mass. Safety Fund
Asso.*, 147 Mass. 368, latter half; *Smith* v. *St. Louis Mut.
L. I. Co.*, 2 Tenn. ch. 741. (The assignment of assets was
made December 13, 1873; see page 734.) *Universal Life
Ins. Co.* v. *Binford*, 76 Va. 110, 113; *People* v. *Security Life,
&c., Co.*, 72 N. Y. at page 127; *Taylor* v. *North Star M.
F. Ins. Co.*, 46 Minn. 198; *In re Minneapolis M. F. Ins. Co.*,
49 Minn. 296–7; *Fogg* v. *Order of the Golden Lion*, 159
Mass. page 12 (second point.)

All its contracts were broken and the company was vir-
tually dissolved when the receivers were appointed. *Taylor*
v. *N. Star, &c., Co.*, 46 Minn. 198. If there has been no
loss on the policy the value of it is the unearned premium
only, if the policy had not expired. *Dean's Appeal*, 98
Pa. St. 101; *In re Ins. Co.* 49 Minn. 296; *Lovell* v. *St.
Louis Co.*, 111 U. S. 264.

Some period of time must be taken as the date to which
policies are to be valued. Some Courts have said the date
of the stoppage of the company's business and appointment
of receivers is to be taken. And this appears to be the
logical view, and more in conformity with the decisions as
to the rights of a policy-holder of a going concern, which,
while solvent, breaks its contracts by conveying away all
the assets. Others have held that the date of the *insolvency
as established by the decree* is the proper date. *Mayer* v.
*Atty.-General*, 32 N. J. Eq. 824. Another, the date of the
*winding up order*, which is the same as saying the date when
receivers were appointed. *Holdech's case*, L. R. 14 Eq. Cas.
80. And still others that the date of the dissolution is the
proper date. *Relfe* v. *Columbia L. I. Co.*, 76 Mo. 602; *Mc-
Donald* v. *Alabama Gold L. I. Co.*, 85 Ala. 408–9; *Dean's
Appeal*, 98 Pa. St. 101, &c. Practically all the authorities

are in unison, for the decisions *all mean* that the date when the company stops business and its assets are sequestrated is to the date which policies are to be valued.

McSHERRY, C. J., delivered the opinion of the Court.

There are twenty appeals in the record now before us. The cases were elaborately and ably argued during the last October term of this Court and the preparation of the opinion was then assigned to the late CHIEF JUDGE ROBINSON. His lamented death occurring shortly afterwards without his having done more than hurriedly sketch an incomplete outline of some of the many questions involved delayed a decision till now. We have had the benefit of JUDGE ROBINSON's notes and will avail of them in this opinion.

The American Casualty Insurance and Security Company of Baltimore City was incorporated under the laws of Maryland in January, eighteen hundred and ninety, and began operations with a paid up capital stock of one million dollars. Its business embraced many and divers lines of insurance and indemnity. It was authorized to write and did write policies of insurance against accidents, against losses by railroads and street railways, arising from injuries to property and persons, whether passengers, employees or strangers ; and it engaged in various other kinds of indemnities. In a little less than four years its whole paid up capital, with the large sums which it had received in premiums —except, however, the funds in Court for distribution—has been swept away by losses, and there are now outstanding liabilities due by it in a very large aggregate amount and to many thousand creditors. Becoming hopelessly insolvent a bill was filed against it by some of its creditors and an order was passed thereon on November the twenty-third, eighteen hundred and ninety-three, appointing receivers to take charge of its assets. The receivers now have in hand certain funds of the insolvent company and the questions before us relate to the method of distributing the same. A portion of these funds is invested in certain securities which

had been deposited by the company with the Treasurer of Maryland, and the residue consists of moneys derived from other sources; and the question which is presented at the threshold is whether the proceeds of these securities when sold and the accrued and accruing interest thereon constitute a special or trust fund applicable to a particular purpose—to the payment of a particular class of creditors—or are general assets available for the settlement of all claims due by the insolvent company.   All of the questions involved were passed upon by the Court below in its order of August the eighth, eighteen hundred and ninety-five, from which order the pending appeals were taken.

After determining by this order what was the special and what the general funds, and after directing how the commissions, costs and auditor's fees were to be paid, the Circuit Court ordered that the taxes claimed to be due to the Mayor and City Council of Baltimore were not properly chargeable upon the assets in the hands of the receivers, and further that there were three classes of creditors.   The order then proceeded to define each of these classes, and prescribed rules for ascertaining the different values of the several policies held by them.   Following, with a single exception, the paragraphs of the order appealed from we come, first, to the question relating to the division of the funds into a special and a general fund.

At the time of the appointment of the receivers there was standing in the name of the Honorable Spencer C. Jones, Treasurer of Maryland, Baltimore City stock of the par value of two hundred thousand dollars, which had been deposited with him by the company as a guarantee for the payment of the policies issued by it.   On December the second, eighteen hundred and ninety-three, the receivers filed their petition in the Circuit Court setting forth the facts in reference to the deposit of these securities, and praying the Court to require Mr. Jones to transfer and deliver them to the petitioners, to the end that the same might be administered under the order and direction of the Court.   To this peti-

tion an answer was filed by Mr. Jones asserting that these securities were held by him as a trust fund for the benefit of the policy-holders of the company and that they could not be applied to any other or different purpose.    Presenting this view he submitted to such decree as the Court might deem proper to pass in the premises.    Upon the petition and answer a decree or order was passed whereby Mr. Jones, the Treasurer of Maryland, was directed to assign and deliver this Baltimore City stock to the receivers, to be held by them for the benefit of the policy-holders, subject to the further orders of the Court.    Whether this fund is a special or trust fund, or, on the other hand, belongs to the general assets of the company, depends entirely upon the facts and circumstances under which it was deposited with Mr. Jones.    If these are such as to create a trust in behalf of the policy-holders, then the fund must be applied as the terms of the trust direct.

In determining whether or not a trust has been created Courts will take into consideration the situation and relations of the parties, the character of the property and the purpose which the settlor had in view in making the declaration.    No technical terms or expressions are needed.    It is sufficient if the language used shows that the settlor intended to create a trust, and clearly points out the property, the beneficiary and the disposition to be made of the property. *27 Am. & Eng. Ency. of Law,* 26, and the citations in notes 1, 2 and 3.    In this case the trust is alleged to have been created by an accident insurance and security company doing business in all parts of the country and having its home office in this State.    In many States of the Union insurance companies of every kind doing business in such States are required to deposit with some one of the State's officers a certain named sum of money or approved securities of a designated value, as a guarantee for the payment of losses sustained by the policy-holders.    And in this State every life insurance company is required to deposit with the Treasurer of the State public securities of the value of one hun-

dred thousand dollars as a guarantee for the payment of
the policies issued by the company. The American Casualty
Company it is insisted however, is not a life insurance com-
pany within the meaning of the Code of Public General
Laws, and was not therefore obliged to make a deposit of
any kind with the Treasurer; and further, that the Treasurer
as such had no lawful authority to accept such deposit. We
need not stop to consider whether the deposit in this case was
made by the company under the impression that it was a stat-
utory requirement, or whether it was made voluntarily with a
view to strengthen its credit and to give confidence to its
policy-holders of its ability to meet its obligations. The
fact is the company did make the deposit with Mr. Jones
and did take from him at the time the following certificate :
" I, Spencer C. Jones, do hereby certify, that I am Treas-
urer of the State of Maryland, and that the American
Casualty Insurance and Security Company of Baltimore
City, a corporation chartered by said State, and located in
the city of Baltimore, has deposited in this office securities
of the denominations and descriptions particularly set forth
and described in the schedule signed by me and hereto an-
nexed, amounting in par value to the sum of two hundred
thousand dollars; and I further certify, that said securities
are now held by me as such Treasurer aforesaid, in my offi-
cial capacity, on deposit as a guarantee for the payment of
the policies of insurance issued by said company. In wit-
ness whereof, I have hereunto set my hand, at the city of
Annapolis, this twenty-eighth day of July, A. D. 1892.
Spencer C. Jones, Treasurer of Maryland." The schedule
annexed to this certificate is entitled " Schedule setting
forth the several denominations and a particular descrip-
tion of the stocks and other securities   *   *   held by me
in trust for the policy-holders of the American Casualty In-
surance and Security Company of Baltimore City, as stated
in the foregoing certificate." Here then is an express dec-
laration by the trustee that this city stock was deposited
with him by the company, and that it was held by him in

trust as a guarantee for the payment of its policy-holders ; and this certificate was delivered by Mr. Jones to the company, and was in its possession at the time the receivers were appointed. An intention to create a trust of this kind may be inferred from conduct and circumstances without any express declaration. *Allen* v. *Withrow*, 110 U. S. 119. In the case at bar we have the most explicit proof of the creation of the trust, for there is the unequivocal declaration of the trustee that he held the funds in trust, and by the acceptance of the certificate there is the direct admission on the part of the company itself as to the existence of the trust, and there is a clear designation of the *cestuis que trustent* who are entitled under it. This is sufficient. *Smith* v. *Darby, 39* Md. 268—a case directly in point. The evidence of the trust then is conclusive, not only as to its creation, but also as to the objects and purposes for which and the persons for whose benefit it was established. And in reply to the objection that Mr. Jones has no right to accept the deposit as Treasurer of the State, it is sufficient to say that it is quite immaterial whether he held it in his official or in his individual capacity. If a trust existed it will not be defeated by the inability of the trustee to act. A Court of Equity will never suffer a trust to fail for the want of a trustee. Nor can the action of Mr. Jones in surrendering the fund under an order of a Court of Equity to the receivers be held to have revoked the trust or to have in any manner affected the rights of the *cestuis que trustent* thereunder. If he did not care to take upon himself the responsibility of distributing the fund among the parties entitled to it, he had the undoubted right either to invoke the aid of a Court in its distribution, or upon the petition of the receivers to surrender it to the Court, whose officers the receivers were. As to sec. 205, Art. 16 of the Code, which requires trustees to whom any property has been conveyed or limited for the benefit of creditors or to be sold for any purpose, to give bond to be filed with the Clerk of the Court, it is only necessary to say

that it has no application to a trust of this character. That section relates only to the assignment or conveyance of property for the purpose of sale, and it provides that no title shall pass to any trustee until such bond shall be filed and approved, and that no sale made by any such trustee without such bond shall be valid.

For the reasons we have given we agree with the Court below that the funds arising from the sale of the city stock and the interest accrued and accruing on that stock until sold must be treated as impressed with a trust and must be applied solely to the payment of the claims of the policy-holders, subject, however, to such prior or paramount liens upon it as will be hereinafter alluded to.

We have just said that we agree with the Court below in that part of the order appealed from which defines the special and the general funds; but we cannot concur in that portion which provides that the general fund shall be set apart for the payment of all creditors " other than the claims of the policy-holders." The policy-holders after they have exhausted the special fund are entitled to participate along with all other creditors in the general fund.

Passing by, for the moment, the intervening provisions of the order relative to the costs and commissions and which will be disposed of later on, we come now to the claim filed by the Mayor and City Council of Baltimore for taxes. This appeal presents two questions: First. Whether the tax levied by the municipality for the year eighteen hundred and ninety-three upon the shares of stock of the company held by residents and non-residents is a debt due and payable by the company or only collectible from the shareholders; and secondly, if the tax be a debt due and payable by the company, is it a prior lien over the claims of all other creditors? These taxes cannot, of course, be considered a debt due by the company unless they are made so by statute, because the shares of stock are the property of the share-holder and under the Code must be valued to him. But the Code further provides that the shares of stock of

corporations owned by residents or non-residents of the State shall be valued at their actual cash value, "but the tax assessed on such stock shall be levied and collected from said corporation, and may be ,charged to the account of such non-resident stockholders" and shall be a lien on the shares held by them respectively. Code, Art. 81, sec. 138, as to non-residents, and sec. 141 as to residents. The statute thus makes explicit provision for a certain and prompt method of collecting the taxes due upon shares of stock, whether held by residents or non-residents, by imposing upon the corporation the obligation and the duty to pay the tax itself. In the case of shareholders not residing in the State it is the only mode in which the State can reach their shares for taxation. *National Bank* v. *Kentucky*, 9 Wall. 353. And when this Court came to deal with the same question, *American Coal Co.* v. *Co. Com. Al. County*, 59 Md. 197, we held that "the statute having created the duty and obligation to pay when the shares are assessed to the individual owners, that duty and obligation on the part of the corporation may be enforced by a proper action at law." It these taxes are a debt due by the corporation they are a debt due by it and to be paid by it regardless of any dividends or profits payable by the corporation to the shareholder and out of which it might be reimbursed. *New Orleans* v. *Houston*, 119 U. S. 265. Though this is conceded to be so whilst the corporation is a going concern, the contention is that when the company becomes insolvent and its property has passed into hands of receivers such taxes cannot be held to be a debt of the corporation for the payment of which its assets are liable. In reply to this, it may be observed that the tax is by the express terms of the statute charged to and made payable by the corporation. If this be so and if the tax was due at the time of the insolvency, then obviously the insolvency could in no manner affect the right of the city to demand payment out of the company's assets. By Art. 4, sec. 827, Code of Public Local Laws, the city of Baltimore is empowered to levy

taxes annually upon the assessable property of the city and
to provide by ordinance for the collection of the same.  The
city has provided by ordinance that taxes levied shall be
paid on or before the first day of October in the year for
which the levy was made, and that the collector may en-
force the payment of the same after giving thirty days notice.
These taxes were consequently due when the company's
assets passed into the hands of the receivers; and being
then due, the Act of 1892, ch. 518, directs that they shall be
paid and satisfied by the officer or person selling under
judicial process the property, real or personal, upon which
such taxes are payable.   As these taxes were due and pay-
able when the company became insolvent, they are, in our
opinion, a prior lien upon the assets in the hands of the re-
ceivers and must be paid out of the general fund, and if that
should be insufficient the balance must be paid out of the
special fund.

This brings us to that part of the order of August the
8th, which classifies the various creditors, numbering in the
vicinity of four thousand.  The order divides these creditors
into three groups.   First: Clerks, servants and employes
to the extent of their salaries or wages due and unpaid for
not exceeding three months prior to the appointment of the
receivers.   These creditors are allowed their claims for sala-
ries and wages due and unpaid for not exceeding three
months prior to November the twenty-third, 1893, as pre-
ferred claims under Art. 47, sec. 15 of the Code, and such
allowance is free from objection, but is, in no contingency,
payable out of the special fund.   Second : Policy-holders
of the company, and, thirdly, all other creditors.

First.  Who are included within the terms clerks, servants
and employees?   By the section of the Code to which ref-
erence has just above been made, it is provided that "when-
ever any person or body corporate shall make an assign-
ment  *   *  or shall be adjudicated insolvent  *   *  or
shall have his, her or its property or estate taken possession
of by a receiver   *   *   in the distribution of the property

or estate of such person or body corporate all moneys due and owing from such person or body corporate for wages or salaries to clerks, servants or employees contracted not more than three months anterior " to such assignment, insolvency or receivership" "shall first be paid in full, &c." Under no circumstances can these claims be paid out of the special or trust fund. That trust, as we have said, was created for a particular purpose and it was created as far back as eighteen hundred and ninety-two, long before any debt now due for wages or salaries and entitled to priority under the statute was contracted. The trust fund devoted to a special purpose cannot therefore be considered such property and estate belonging to the company at the time it became insolvent as would be liable for the satisfaction of these claims.

In the case of *Lewis* v. *Fisher et al.*, 80 Md. 139, we held that an attorney at law was not a clerk, servant or employee; and we have now to determine whether an insurance adjuster is within these terms. What is the precise nature of the duties of an adjuster the record does not disclose. But an adjuster was not, as we understand it, a person in the continuous employment of the company; that is, one who devoted his whole time and service uninterruptedly to the company. In his petition Mr. Phelps says he was employed as an adjuster in the State of Alabama at a salary of one thousand dollars and expenses. It was his duty and the duty of other adjusters when an accident occurred to ascertain all the facts and circumstances in connection with such accident—how it happened, whether it was through the fault of the insured corporation, the nature and extent of the injury, and to make report thereof to the company. All this involved the exercise of judgment and discretion and required some familiarity with the principles of law relating to the legal liability of the insured. Now, it is clear, we think, that the word " employee " as used in the statute was intended to have a limited meaning, and that it cannot be applied in its broadest sense, or as including every one in the service or employment of a corporation or indi-

vidual.  The object of the statute was to provide for the
payment of the wages and salaries due a certain class of
persons to whom such wages or salaries were deemed always
necessary for their support and maintenance.  The statute
first provides for the payment of the wages and salaries of
clerks, persons rendering mere clerical services, then, of
servants or employees.  The statute did not mean by em-
ployees persons rendering services of a higher degree than
clerks.  The duties of an adjuster being, as far as we are
able to discover, of the character we have described, these
officers, whilst in a general sense employees, cannot by any
fair rule of construction be considered employees in the
limited and restricted meaning of that term as used in the
statute.  To hold otherwise would result in the inclusion of
a large class of persons in the service of a company or indi-
vidual as preferred creditors, though they are obviously not
within the scope, purpose and object of the Code, under
which provision is made for a preference.

But it was insisted that the conclusions reached by this
Court in *Lewis* v. *Fisher et al., supra*, are in conflict with
the decision in *Moore* v. *Heaney*, 14 Md. 558.  Such is not,
however, the fact.  Two entirely different statutes, relating
to different subjects, were construed in the two cases.  In
*Moore's case* the Act of 1854, ch. 23, relating to the exemp-
tion of the wages or hire of "a laborer or other employee"
from attachment, was interpreted; whilst in *Lewis's case* the
identical statute now involved—the Act of 1888, ch. 383,
Art. 47, sec. 15 of the Code—was before us.  In *Moore's
case* this Court gave a wide and liberal meaning to the word
"employee," so as to bring as large a class of persons as
possible within the provision which created an exemption in
favor of laborers and other employees from the stringent
terms of the attachment law and from the equally harsh
effects of an attachment levied by way of execution on
wages.  The Act of 1854, creating an exemption in favor
of a class of persons least able to protect themselves and
largely dependent on their wages for support, was given a

liberal and not a technically strict construction that might perhaps have been placed upon it. But the Act of 1888 (Art. 47, sec. 15 of the Code), was designed to create a preference in behalf of certain creditors in the distribution of an insolvent's assets, and to that extent it disturbs and destroys the equality amongst all the creditors, which equality it was the obvious, if not declared, policy of the insolvent system to promote and preserve. Hence it was that without questioning the decision in *Moore's case*, which defined the words "other employee" as used in a statute relating to one subject, we gave in *Lewis' case* to the term "employee" as used in another and a totally different statute, and as restricted by the context and by the words with which it was associated a less comprehensive signification. The same word used in different statutes relating to different subjects does not necessarily have the same meaning. As observed by POLLOCK, C. B., in *Reg*. v. *Skeen*, Bell C. C. 97, "there is no word in the English language which does not admit of various interpretations."

We come now to the rules laid down in the order of August the eighth for ascertaining the values of the various policies; and it will be necessary for the sake of clearness to make some general reference to the nature and character of these contracts of insurance or indemnity. No useful purpose could be served, but this opinion would be protracted far beyond all reasonable limits, if the provisions and stipulations contained in the various policies were set forth at large. We may say, however, that with suitable modifications and changes to adapt them to the particular character of loss designed to be covered in each case, and to adjust them to the sort of business in which the insured was engaged, all the policies purport to be either individual accident insurance policies, employee's indemnity bonds or contracts under which, for a designated and agreed consideration, the company stipulated to indemnify the assured against liability for damages (not exceeding a specified amount) which might arise out of injuries to property, or

out of an injury to, or the death of, certain persons standing in various relations to the assured—these injuries both to persons and to property and these deaths happening upon described premises and being such as the assured might, in consequence of being responsible for their occurrence, be legally bound to answer for in damages.    The object of the insurance then, except in the case of a mere individual accident policy, was to provide means with which the assured might be reimbursed for any loss he had sustained if he were the holder of an employee's indemnity bond, or for any damages which he might lawfully be required to pay and did in fact pay by reason of such injuries or deaths as the policies covered, if he were the holder of the other classes of indemnity.    The amount actually paid by the assured to the person injured or to the representatives of the person killed or to the owners of the property damaged or destroyed, settled and measured, within the limits specified in the policy, the extent of the insurer's liability.    And whilst the mere liability of the assured to pay unascertained damages for any of the causes set forth in the contract of indemnity did not determine the precise amount which the insurer was bound to pay to reimburse the assured, it nevertheless fixed the insurer's liability to the assured under the contract.    The happening of the event which subjected the insured to a claim for damages established the period when the corelative obligation of the insurer became complete and ceased to be contingent except as to the amount to be paid.    The liability of the insurer was thereby fixed, though the extent of that liability might, and in most cases must necessarily have been unascertained until a subsequent period.

Now, the insolvency of the company cancelled all outstanding policies of insurance for the future.    *Doane* v. *M. I. Co.*, 43 N. J. Eq. 522.    It is apparent that all casualties for which the various insured corporations and individuals holding the insolvent company's policies might be responsible must have happened either before or after the date of

the insolvency.    If the accidents, which form the basis of the claims now made for indemnity, happened *after* the insolvency was declared, then, inasmuch as the insolvency cancelled the policies, there can be no claim under the policies, but as the company by its insolvency committed a breach of its contracts, the policy-holders thereupon became entitled to damages for that breach, and these damages are the values of the destroyed policies.    *Mason* v. *Cronk*, 125 N. Y. 503 ; *People* v. *Security Life Ins. Co.*, 78 N. Y. 125. The policies being thus destroyed, of course, all liability under them, from the date of the insolvency, for accidents occurring subsequently to the insolvency, ceased, consequently losses which happened after the insolvency under policies in existence at the date of the insolvency, are not provable against the funds in the receiver's hands.    Whilst this is so, the values of the destroyed policies *are* provable, and according to well-settled rules, these values consist solely of the unearned or return premium.    And this the Circuit Court decided.    With respect to the other category, the occurrence of the casualty *before* the date of the insolvency—there are two contingencies presented : First, where the accident or injury insured against occurred and the damages were ascertained and actually paid by the assured *before* the appointment of the receivers ; and secondly, where the accident or injury insured against happened before the appointment of the receivers, but the amount recoverable from the assured remained unascertained and unpaid till *after* that date.    As to the first of these contingencies, and in so far as the policy covers no other loss, there is and can be no dispute, and the Court below properly held with respect to such policies that their value was a sum of money equal to the sum of the loss and the return or unearned premium.    But as to the second of the above contingencies we think the Court was in error.    With respect to the policies falling within this second contingency the order of August the eighth declared :  " But no cause of action, nor action, nor suit pending against the claimant,

nor judgment, nor decree against the claimant unsatisfied before November 23rd, 1893, by the claimant, is a loss sustained by the claimant, nor can any claim be made or any judgment or decree rendered against the claimant and satisfied by him prior to November 23rd, 1893, except for the amount actually paid in settlement thereof." As already observed, these policies in so far as they related to a period subsequent to the appointment of the receivers and covered no antecedent loss or injury, were, by operation of law, annulled when the company became insolvent; but for the consequences of accidents or other casualties which occurred anterior to the insolvency and which subjected the assured to a liability or a loss the amount of which remained undetermined or unsatisfied until after the receivers were appointed, the policies were unaffected and the obligations arising under them were unimpared by the company's insolvency. It is not solely because the insured has actually paid damages that the liability of the insurer to him is fixed; but it is because an accident or casualty or occurrence has happened for which he is responsible and against the loss arising from which he has been indemnified that the obligation of the insurer to reimburse him arises, though the precise amount to be paid by the insurer may depend for its ascertainment upon events happening after the insolvency. In other words, the contingent liability of the insurer to reimburse the insured becomes a fixed liability the moment an event happens which fastens a responsibility on the insured, if that event be within the terms of the policy; but the amount of the liability continues to be contingent till the precise extent of the demand against the insured is established and paid. This contingency as to amount in no manner derogates from the fact that a liability for some amount has arisen and become fixed. In all instances, therefore, where the loss or injury happened before the insolvency, though the amount thereof was not ascertained and was not paid by the insured until after the insolvency the holder of the policy will be entitled to prove

for a sum equal to the loss or damages paid by him *plus* the return premium, if any.

What has been said above is sufficient to indicate that we also dissent from the third rule laid down by the Circuit Court for ascertaining the value of the class of policies in that rule referred to.    When the liability became fixed prior to November the 23rd, 1893, the insolvency on that date did not extinguish the assured's claim upon the assets and did not put an end to the assured's right to indemnity.  To the return premium in the cases described in this rule must be added what would have been payable under the policy° after November the twenty-third had no insolvency supervened.                                          °

If by the fourth rule laid down in the order of August the 8th it is meant that no loss arising from occurrences which happened after November the 23rd gives rise to a claim against the assets, we see no error in the rule ; but if it means that no such claims exist if the accident or casualty occurred before November the 23rd and the amount was not ascertained until after that date, then, for the reasons we have heretofore given, we regard this fourth rule as erroneous.

There must of necessity be many outstanding and unascertained claims pending against holders of the company's policies, which claims may require some time for adjustment ; but it is of great importance that the company's assets should be distributed at as early a date as practicable, and hence the settlement of its affairs ought not to be postponed to await the determination of every contingency on which its policy engagements are suspended. *Carr* v. *Hamilton*, 129 U. S. 256.   To obviate all unreasonable delay and yet to afford an opportunity to each policy-holder, who may be entitled to prove against the company's assets, it will be the duty of the Circuit Court to prescribe by an order that all claims be filed on or before the second Monday of June next, or otherwise be barred from participation in the distribution.   This may result in cutting out some

claims but that will be unavoidable unless the distribution be postponed for a considerable space of time; and such a course would occasion unnecessary loss to those whose claims are in a condition to be proved. If by that date there should be outstanding claims not reduced to a certain basis it will be the misfortune of the assured; but there is no way of obviating that misfortune. *May on Ins.*, sec. 594, *a*.

By a prior clause of the order of August the eighth it was provided "that each owner and holder of or person having any lawful claim upon any of said classes of insurance policies or any similar policy of the defendant corporation, issued prior to November 23rd, 1893, for a period to extend beyond said date, who duly paid the premium thereon for the entire period or any portion of it extending after November 23rd, 1893, as agreed between the policyholders and the said company, is entitled to claim upon the value thereof on November 23rd, 1893, and to receive dividends upon such value out of the net special fund." If the design of this provision was to exclude all policies which did not cover a period of time extending beyond November the 23rd, 1893, the provision is obviously erroneous. Such an exclusion would cut out a claim matured and perfected during the life of the policy whose limit of duration terminated the day before the appointment of the receivers, and under which nothing remained to be done by the insurance company but to reimburse the insured.

In respect to that part of the order which charges the special fund with the payment of costs and expenses that the general fund may be insufficient to meet, it is only necessary to say this special fund being a trust fund devoted to a particular and special purpose, cannot be diverted therefrom or applied to any other or different object; and except in so far as it is liable for the payment of the taxes which are paramount to all other claims, it must be distributed to the policy-holders for whom it was set apart and can be charged with no portion of the costs and commissions incurred in administering a totally distinct fund.

But two questions more remain to be considered.   One
is of considerable interest.   In the argument at the bar it
was insisted with great earnestness and marked ability that
all policies issued by the Casualty and Indemnity Company
to carriers of passengers indemnifying the carriers against
their liability for injuries to persons are void because con-
trary to public policy.   The contention is that as the law
exacts from the carrier of passengers the exercise of the
utmost care and diligence which human foresight can use
to avoid an injury, any contract which relieves the carrier
of his duty to the public in this regard or lessens his liabil-
ity for all or any of the wilful, criminal and negligent acts
of his emyloyees or his managers and himself, is detri-
mental to the interests of the public as understood by the
Courts at this time, and is therefore repugnant to public pol-
icy.   No exact definition of public policy has ever been given
or can be found.  Speaking generally, the principle which holds
that no one can lawfully do that which has a tendency to
be injurious to the public, or against the public good, may
be termed the policy of the law, or public policy in relation
to the administration of the law.   19 *Am. & Eng. Ency.
Law.* 565.   In *Richardson* v. *Mellish*, 2 Bing. 229, MR. JUS-
TICE BURROUGHS pointedly observed:  " I for one protest
against arguing too strongly upon public policy ; it is a very
unruly horse, and when once you get astride it you never
know where it will carry you.   It may lead you from the
sound law.   It is never argued at all but when all other
points fail."   It is one thing at one time, another thing at
another time, and its very vagueness shows that it does not
admit of exact or precise definition, and that it is not easily
explained.   If this statement requires authority, said KEKE-
WICH, J., in *Davies* v. *Davies*, 36 Ch. D. 364, when discussing
public policy as affecting contracts in restraint of trade,
" turn to *Egerton* v. *Earl Brownlow*, 4 H. L. Cas. 1, and
consult the arguments of counsel and opinions of Judges
covering the whole subject  *  *  *  *  *  One thing
I take to be clear and it is this, that public policy is a

variable quantity; that it must vary and does vary with the habits, capacities and opportunities of the public; that it cannot have been the same when CHIEF JUSTICE TINDAL decided *Horner* v. *Graves*, 7 Bing. 735, in 1831, as it was when CHIEF JUSTICE PARKER decided *Mitchell* v. *Reynolds*, 1 P. Wms. 181, in 1711; that it must have changed and did change between 1831 and 1869, when VICE-CHANCELLOR JAMES decided *Leather Cloth Co.* v. *Lorsont*, L. R. 9 Eq. 345; and if there had not been further change before LORD JUSTICE FRY decided *Rousillon* v. *Rousillon*, 14 Ch. Div. 351, in 1880, it must have occurred ere now." The wisdom and correctness of these observations are strikingly illustrated in the development and change and expansion of the law from the crude, rigorous and harsh exactions of past centuries to the liberal, enlightened and advanced policy of to-day, in relation to the liability of a carrier of goods, his right to restrict that liability by contract, and to insure against loss and injury the property entrusted to him, and of which he, himself, is, under the law, an insurer. By the common law the carrier was treated as an insurer, and was bound to keep and carry safely all goods consigned to his care, and he was liable for all losses, and in all events except for losses caused by the act of God and the King's enemies. *Chitty on the Law of Carriers*, 34; *Balto. & Ohio R. R. Co.* v. *Green*, 25 Md. 89. This rule of responsibility did not have its origin in contract, but was founded on grounds of public policy. "For though," said LORD HOLT in *Coggs* v. *Bernard*, 2 Ld. Ray. 900, "the force be never so great, as if an irresistible multitude of people should rob him, nevertheless he is chargeable; and this is a politic establishment, contrived by the policy of the law for the safety of all persons the necessity of whose affairs obliges them to trust these sort of persons, that they may be safe in their dealings. For else these carriers might have an opportunity of undoing all persons that had any dealings with them by combining with thieves, and yet doing it in such a clandestine manner as would not be possible to be discovered."

Afterwards, when the better administration of the law afforded greater protection to the carrier against the depredations of thieves, and had lessened the opportunities for fraud and collusion, the strict rule of the common law was measurably relaxed, and the carrier was permitted to limit his responsibility by special contract, where the limitations were just and reasonable.    But even this departure was of gradual development.    For in *Barney et al. v. Prentiss*, 4 H. & J. 317, the Court declined to express an opinion on the carrier's right to restrict his liability ; but in *Brehme* v. *Adams Ex. Co.*, 25 Md. 328, the right was distinctively recognized and is undoubtedly now the law.    *N. Y. Cent. R. R. Co.* v. *Lockwood*, 17 Wall. 357 ; *McCoy & Parkhurst* v. *Erie & West. Trans. Co.*, 42 Md. 498.    The conclusions reached in the carefully considered and exceedingly able opinion delivered in *Lockwood's case, supra*, were first, that a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.    Secondly. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.    Thirdly. That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter. Whilst the carrier will not be permitted by contract or otherwise to exempt himself from liability for losses caused by his own negligence or the negligence of his servants, there is no reason of public policy which prohibits him from contracting with a third person for insurance against these very same losses.    Consequently he may by insurance indemnify himself against loss of or injury to property entrusted to his care, even where the loss or injury is caused by his own or his servant's negligence.    This was decided in *Phœnix Ins. Co.* v. *Erie & West Trans. Co.*, 117 U. S. 324; and the ground upon which the decision was based was that such insurance did not diminish the carrier's own responsibility to the owner of the goods, but

increased the means of meeting that responsibility.  Not-
withstanding such insurance the carrier remains liable to
the owner or shipper of the goods, and by insuring them
he merely contracts, as in every other instance of a reinsur-
ance, with some one else for reimbursement for such loss.
The doctrine announced in the *Phœnix Ins. Co.'s case,
supra*, was affirmed in *Cal. Ins. Co.* v. *Union Compress Co.*,
133 U. S. 387, and is the settled law of the land.  A rea-
sonable restriction by contract of his common law liability
and an insurance by the carrier of goods against loss are
recognized by the law and are not in contravention of its
policy to-day, whatever that policy might have been here-
tofore.

It is obvious that a carrier of passengers cannot by con-
tract restrict, diminish or limit that obligation to the public,
or that duty to the passenger, which requires the exercise
of the highest degree of care and diligence on his part.  A
contract which stipulates for or agrees to such relaxation,
and therefore contemplates immunity from the carrier's
own negligence, would be utterly void ; precisely as would
a contract purporting to relieve a carrier of goods from lia-
bility for losses occasioned by his own or his servant's
negligence.  But the policies before us are not contracts of
that character.  Neither in express terms nor by implica-
tion do they profess or purport to abridge, in any way,
the carrier's common law liability for injuries to passen-
gers, employees or strangers.  These policies leave that lia-
bility precisely where and as complete as it was before they
were written.  They contain no provision impugning ·or
questioning in the slightest degree the full measure of that
responsibility.  It is perfectly manifest, therefore, that they
are not in terms contracts restricting or attempting to re-
strict the carrier's conceded liability ; and if they contra-
vene public policy at all, it must and can only be
incidentally and indirectly.  This is all that can be imputed
to them.  But they are all, it is alleged, repugnant to pub-
lic policy because by furnishing the carrier with a fund with

which to reimburse himself for losses caused by his own negligence, their inevitable tendency or effect is to induce less vigilance, or to promote greater carelessness on the part of the carrier. Precisely the same reasoning would invalidate, as repugnant to public policy, every species of fire and marine insurance. To the extent that a fire insurance policy affords an individual protection against loss, to exactly the same extent may it be said the assured will become indifferent in guarding against casualties from fire. And in so far as a carrier may have a policy covering goods and insuring them for his own benefit against losses arising from his or his servant's negligence just so far will he be either tempted to be negligent, or become indifferent as to vigilance. But in neither instance can it be said that because a temptation to be negligent, may possibly result from the possession of an insurance policy, the contract of insurance necessarily begets negligence or conflicts with public policy. Nor can we assume as an unvarying rule, of which judicial notice will be taken, that a carrier of passengers who has secured an indemnity to reimburse himself for losses which his own negligence may produce, will, merely because and solely in consequence of having such indemnity—which at best is but limited and partial—necessarily disregard the duty to exercise the highest degree of care. And unless it be assumed as a postulate that the mere possession of an indemnity will of itself necessarily and invariably produce negligence, it does not logically follow that such a policy or indemnity is even incidentally or indirectly repugnant to public policy. The indemnity in no way affects the liability of the carrier to the person injured. The utmost that it does, precisely as in the case of a carrier of goods is to afford him a fund out of which he may be reimbursed, and that too, perhaps, but partially ; for in all these policies the liability of the insurer is always limited and confined to a specifically designated sum. The compensation to an individual, whether passenger, employee or stranger, is after

all a money compensation, and though the life or limb of a person may be and most certainly is of greater intrinsic value than goods and chattels, still the law knows of no other means of making compensation or approximate compensation in either instance than by the assessment of damages in dollars and cents.

If in the development and progress of the law the ancient rules have been relaxed, in the case of a carrier of goods so as to enable him to insure against his own negligence when the result of that insurance is to furnish him the means to make compensation to the owner or shipper of goods, we see no valid reason for holding that the law in its advance to conform to the "habits," capacities and opportunities of the public has not reached the stage of allowing a carrier of passengers *not* to contract for a restriction of his original liability, but to purchase from a third party an indemnity fund with which to make more certain his ability to respond in damages for personal injuries caused by his carelessness and neglect.    As public policy is a varying quantity, changing with the habits of the people, there is nothing in it as it exists at this day to warrant us in saying these policies infringe it.    But how can an insurance or indemnity of this kind be contrary to that vague, indefinite and "variable quantity" called public policy; when no restriction is placed on the carrier's liability or duty to the public or to the individual, and no attempt is made in the contract of indemnity to interfere with the relations between the carrier and the public, or the carrier and the individual as those relations existed under the law prior to the writing of the policy? We have said the only suggestion in answer to this inquiry is that a tendency to relax the carrier's vigilance necessarily results from the fact that under the policy a fund is provided out of which he may be reimbursed the sums he may be obliged to pay as penalties occasioned by his own negligence.    But this not only does not meet the objection that no such relaxation of care and diligence is stipulated for in the contract of insurance or in any contract between

the carrier and the passenger or other individual, but it lays out of view a consideration of which the most casual observer cannot fail to take note—and it is this: The carrier will, from motives of self-interest, if from none other, endeavor to reduce the sum total of his insurance to a minimum figure and thereby diminish the amount of the annual premium payable therefor, whilst the aggregate of insurance which he may be able to procure as well as the rate charged him for it, will always depend in a large measure, if not entirely, upon the prudence, care and skill with which his affairs are managed and conducted. Such a carrier has, consequently, exactly the same motive or incentive to protect the public and the individual from injury that he would have if he should become his own insurer, or were a carrier of goods and therefore the insurer of them. Stretching the doctrine of public policy to the extent of striking down these policies would, in the language of MR. JUSTICE BURROUGHS, "lead you from the sound law." And as according to the same learned Justice this doctrine "is never argued at all but where all other points fail," it would be of doubtful expediency to invoke it where the only apparent consequence of obtaining such insurance would be not to diminish the carrier's own responsibility, but rather to increase his means of meeting that responsibility. The fallacy of the objection urged against the validity of these policies lies in the failure to distinguish between a contract, which, on the one hand, stipulates with the passenger for immunity on the part of the carrier from the consequences of the latter's breach of duty; and a contract whereby, on the other hand, the carrier, whilst in no way diminishing that liability, merely agrees with a third person to procure from the latter a fund out of which to pay, perhaps the whole, but at least; a portion of the damages which he may be chargeable with on account of his failure to observe and discharge his duty.

As remarked by MR. JUSTICE STORY in *The Ocean Ins. Co. v. Polleys*, 13 Pet. 164: "We all know that there are cases

where a contract may be valid, notwithstanding it is re-
motely connected with an independent illegal transaction,
which, however, it is not designed to aid or promote."
Now, it is perfectly obvious the Casualty Company never
intended, by writing policies for carriers of persons, to aid
or promote carelessness or negligence on the part of the
assured. Its manifest interest to avoid the payment of
heavy amounts to reimburse the assured for the damages
which might be recovered in consequence of such negli-
gence was alone sufficient to exclude the inference that by
writing these policies its purpose was to aid or promote
negligent, and therefore, illegal conduct on the part of the
carrier; and though its liability might depend on just such
negligence, its contract was not made to promote it; nor did
the underwriter, directly or indirectly, stipulate for any
breach of duty by the carrier towards the public or the in-
dividual. The thing done by the insured might subject
him to an action for damages because wrongfully done; but
the distinct and independent contract to partially reimburse
him those same damages was "in no respect designed to
aid, assist or advance any such illegal act." In the case
last above cited from 13 Pet., a policy of insurance written
upon a schooner for the term of one year was the cause of
action. The schooner was totally lost by the perils of the
sea whilst the policy was in force. The insurance company
insisted that the schooner on the voyage on which she was
lost was sailing under circumstances rendering her liable to
forfeiture for a violation of the laws of the United States;
and that therefore a policy on a vessel pursuing such a voy-
age was not valid, or legal and binding. The Supreme
Court said: "The objection, then, as insisted on by the
counsel for the insurance company, involved two distinct
propositions. The first was, that the schooner was sailing
on the voyage under circumstances which rendered her
liable to forfeiture. The second was, that the policy on her
was therefore void. Now the first might have been most
fully admitted by the Court and yet the second have been

denied, upon the ground that the policy was a lawful contract in itself and only remotely connected with the illegal use of the certificate of registry ; and in no respect designed to aid, assist or advance any such illegal purpose."

We see no reason to hold that these policies are void because against public policy.

There is but one other question to be considered and that relates to the claim of the West End Street Railway, one of the appellants. A policy was taken out by this company for a year, expiring August the first, 1892. It contained a provision allowing the insured to renew; at its option, the same policy for three years from the above date. The insured gave notice of its intention to claim and it did claim an extension or renewal of the policy under the option ; but the insurer refused to renew. The West End Company claims that the policy is still in force. To this we do not assent. If the insured intended to rely on the contract it was its duty to have paid the premium or at least to have tendered the premium and demanded a renewal. *Dungan* v. *Mut. B. L. I. Co.*, 46 Md. 469. It did neither, and the policy thereupon ceased to be effective.

We think no interest should be allowed on the claim for taxes or on any of the other claims filed against the insolvent company. Whilst not precisely analogous, the case of *Hutchinson* v. *Liverpool & Lon. & Gl. Ins. Co.*, 153 Mass. 143, supports this conclusion. It is not easy, if indeed it be possible, to place upon a consistent basis many of the decisions in which interest has been allowed or disallowed. Perhaps some of the numerous claims might in strictness be entitled to an allowance of interest under ordinary circumstances ; but it does not appear that the amounts asserted to be due have been wrongfully withheld by the Casualty Company. The failure to pay, as far as we can see, has been the result of the company's insolvency. A penalty or damages in the way of interest ought not, therefore, to be added to the sums actually due.

It results from what we have said that the order of Au-

gust the eighth, eighteen hundred and ninety-five, will be affirmed in part and reversed in part and the causes, except those that will be dismissed, must be remanded to the end. that another order may be passed conforming to this opinion.

> *Order offirmed in part and reversed in part, and causes remanded to the end that another order may be passed in conformity to this opinion; one-half the costs in all the cases to be paid out of the general fund, the other half to be paid out of the special fund.*